**STATE of Tennessee**

v.

**Paul Dennis REID, Jr.**

Supreme Court of Tennessee,
at Nashville.

Nov. 26, 2002.

Order Denying Petition for Rehearing
Dec. 19, 2002.

Jeffrey A. DeVasher; C. Dawn Deaner; J. Michael Engle; and David Baker; Assistant Public Defenders, Nashville, Tennessee, for the Appellant, Paul Dennis Reid, Jr.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Jennifer L. Smith, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Kathy Morante, Tom Thurman, Roger Moore, Grady Moore, Assistant District Attorney Generals, for the Appellee, State of Tennessee.

## OPINION

FRANK F. DROWOTA, III, C.J., delivered the opinion of the court, in which E. RILEY ANDERSON, JANICE M. HOLDER, and WILLIAM M. BARKER, JJ., joined.

In this capital case, the defendant, Paul Dennis Reid, Jr., was convicted of two counts of first degree murder and one count of especially aggravated robbery for killing two Captain D's employees and robbing one of the employees. As to each conviction of first degree murder, the jury found in the sentencing hearing that the State had proven three aggravating circumstances beyond a reasonable doubt—(1) that the defendant was previously convicted of one or more felonies, other than the present charge, the statutory elements of which involve the use of violence to the person; (2) that the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; and (3) that the murder was knowingly committed, solicited, directed, or aided by the defendant while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a

substantial role in committing or attempting to commit robbery. Tenn.Code Ann. § 39–13–204(i)(2), (6), and (7) (1997). Finding that these aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt, the jury sentenced the defendant to death on each murder conviction. The trial court subsequently imposed a twenty-five-year sentence for the especially aggravated robbery conviction and ordered this sentence to be served consecutively to the two death sentences. On direct appeal to the Court of Criminal Appeals, the defendant mounted numerous challenges to both his convictions and sentences. After fully considering the defendant's claims, the Court of Criminal Appeals affirmed the trial court's judgment. Thereafter, the case was docketed in this Court. See Tenn.Code Ann. § 39–13–206(a)(1) (1997). After carefully and fully reviewing the record and the relevant authority, the defendant's convictions and sentences are affirmed.

## I. Background

### A. Guilt Phase

The proof offered by the State at the guilt phase of this trial demonstrated that on Sunday morning, February 16, 1997, sixteen-year-old Sarah Jackson and twenty-five-year-old Steve Hampton were shot and killed as they prepared to open the Captain D's restaurant on Lebanon Road in Donelson, Tennessee. Hampton was the manager of the restaurant; Jackson was a high school student working part-time at the restaurant. Kevin Blackwell, area director for Captain D's, spoke with Hampton on the telephone around 8:15 to 8:30 a.m. that morning. Over an hour later, around 9:45 to 10 a.m., Michael Butterworth arrived for work but was unable to enter the restaurant because the doors were locked. Butterworth telephoned the Captain D's from a neighboring restaurant and got a busy signal. When he called a second time a few minutes later, no one answered. Believing something was wrong, Butterworth contacted another Captain D's employee whose father was a Metro police officer. The employee's father, Officer Jeff Wells, arrived at the scene and, after the assistant manager of Captain D's unlocked the door, entered the restaurant between 11 a.m. and noon to find Hampton and Jackson dead, lying face down on the floor inside the restaurant's walk-in cooler.

The victims had been shot execution-style while lying on the floor. Hampton had been shot twice in the back of the head and once in the back. Jackson had been shot four times in the head and once in the back. According to the medical examiner, two of Jackson's head wounds were fatal, but the two other head wounds were superficial, and the shot to her back was not immediately incapacitating. If these less serious wounds had been inflicted first, the medical examiner testified Jackson may have been able to move; and, in fact, a blood pattern of Jackson's gloved hand on shelving near, but above, her body indicated that Jackson had attempted to pull herself up from the floor after she was shot. The victims were shot with a .32 caliber weapon, probably a revolver. Seven thousand, one hundred forty dollars, including $250 in coins, was taken in the robbery. Hampton's wallet, which contained $600 that he intended to use to pay rent, also was missing.

The police first considered the defendant a suspect in this crime on June 12, 1997, after his arrest in Cheatham County for allegedly attempting to kidnap the manager of a Shoney's restaurant. From this arrest, the police obtained the defendant's fingerprints and photograph. Although none of the defendant's fingerprints were found at Captain D's, several

items belonging to Steven Hampton were discovered one day after the murders lying alongside Ellington Parkway, a four-lane highway in East Nashville.[1] Among the items found was a movie rental card belonging to Hampton. The defendant's right thumbprint was found on this card. The area where Hampton's belongings were found was 11.5 miles from the crime scene and 1.2 miles from the defendant's home.

Police also found several shoe prints inside Captain D's near the safe. Although the tread design of these shoe prints did not match, the length of these shoe prints was consistent with shoes seized from the defendant's residence. In addition, the State introduced into evidence a photograph, dated July 16, 1996, which showed the defendant wearing a pair of dingy white tennis shoes that police had not found in his residence.

Two witnesses identified the defendant as the man who came by Captain D's the night before the murders inquiring about a job. Michael Butterworth and Jason Carter testified that a man came into the restaurant through the exit door around 10 p.m., shortly before closing the night before the murders. This man said he was interested in applying for a part-time job and that he worked at Shoney's just down the road. The proof showed the defendant worked as a cook at a Shoney's 2.1 miles from these murders. Butterworth and Carter gave the man an employment application and told him that the manager, Steve Hampton, would be working the next day. When the man asked if anyone would be at the restaurant on Sunday morning, Carter told him that Hampton would be there but would be busy and unable to talk until approximately 2:45 p.m., after the Sunday lunch rush. Butterworth testified that the man left in a dark-colored car.

About a week after the murders, Butterworth, Carter, and James Cassidy, another employee who was present the night before the murders, helped police prepare a composite sketch of the man they had seen. The description they provided was consistent with the defendant in some respects, but the sketch did not include a mustache and it indicated that the man may have had long hair worn in a ponytail that was "pulled straight back." The defendant wore a mustache at this time and did not have a ponytail, although there was testimony that his hair had been below his collar at that time and that he combed his hair straight back.

After assisting with the composite, Carter and Butterworth looked at hundreds of police photographs but were unable to make an identification. In June of 1997 the police showed Butterworth and Carter a photographic lineup of six individuals, including the defendant. Although Butterworth was unable to make a positive identification, Carter positively identified the defendant as the man who had inquired about a job the night before the murders. A short time later, Butterworth saw the defendant during a television news report about his arrest. Butterworth immediately called the police and informed them that the defendant was the man who came into Captain D's the night before the murders.

---

1. Police discovered Hampton's personal effects because of information provided by Mr. Charles Simpson, who, while looking for aluminum cans alongside Ellington Parkway on the afternoon of the murder, discovered Hampton's children's identification cards. Believing that the owner of the cards had been robbed but unaware of the murders, Mr. Simpson immediately reported his discovery to police. The next day, February 17, 1997, officers returned to the same area and found Hampton's driver's license, credit card, movie rental card, and birth certificate card.

At trial, Butterworth explained that he was sure of this identification because the news report, as opposed to the photographic lineup, enabled him to hear the defendant's voice, see the way his lips moved when he talked, and see the way he walked. During trial, both Carter and Butterworth identified the defendant as the man who had come into the restaurant the Saturday night before Hampton and Jackson were killed.

Three other people who had been driving by the Captain D's restaurant on the morning of the murders testified, linking the defendant to the murders. Jerry Marlin, who was passing by the restaurant at approximately 8:45 a.m., saw a blue Ford station wagon with damage to the left front, and possibly to the left rear, "parked at a funny angle toward the rear of the building." The proof showed that prior to these murders, the defendant drove a light blue 1988 Ford Escort station wagon which had been involved in an auto accident in January of 1997. As a result, the car was appraised by an insurance company on February 3, 1997, and was found to have damage to the left front end. Marlin testified that the defendant's car in the insurance company's photographs was similar to the car he observed in the Captain D's parking lot the morning of the murders.

Around 8:50 a.m., Debbie Hines was driving by Captain D's on her way to church when she saw a man, whom she later identified as Steve Hampton, standing inside the doorway of the restaurant talking to a man outside who was holding white paper in his hand. Hines described the unidentified man as dark-haired and approximately five inches taller than Hampton. This description was consistent with the defendant who was dark-haired and approximately six feet, three inches

tall, as compared to Hampton whose height was five feet, eight inches.

Around 9:30 a.m., another passerby, Mark Farmer, noticed "a car that sort of looked out of place." According to Farmer, the small to medium-sized car was parked about a car-length away from the front of the building headed in the opposite direction of the drive-thru arrows painted on the lot. Farmer initially remembered it was a light blue car, but at trial he stated it also may have been painted a "pinkish plum color." Farmer also noticed a man walking hurriedly away from the restaurant toward the car. When the man stopped at the passenger side of the car and looked up, Farmer testified that the man "elevated his face and ... it seemed like our eyes sort of caught one another, and when he saw that I was watching him, he dropped his head, just completely down in a suspicious way." The man entered the passenger side of the car. Farmer described the man as tall, with a muscular build and large neck, dark eyebrows and dark eyes, a full head of hair which was slicked back. Farmer said the man was wearing a white shirt, dark pants, and white, "not new," tennis shoes. Farmer heard about the murders the next day and called the police twice to report what he had seen, but no one contacted him. When Farmer saw the defendant on television after his arrest in June of 1997, Farmer again called the police and identified the defendant as the man he had seen near the Captain D's on the morning of the murder.

The State also offered proof to show that the defendant had been interested in obtaining a gun during the months before the murders and had discussed the profitability of robbing fast food restaurants. Jeffrey Potter, the defendant's co-worker at Shoney's, testified that the defendant was dissatisfied with the money he made at Shoney's and told Potter there were other

ways of making money, and one way to do so was robbery. The defendant also had asked Potter where he could get a gun, and then had asked Potter to get the gun for him. Potter refused.

Another of the defendant's co-workers, Danny Wayne Tackett, testified that he had first met the defendant in 1995, while working at Shoney's. The defendant had moved to Texas but returned to Tennessee in 1996. Tackett described himself as the defendant's best friend in Nashville and said the defendant had lived with him a few weeks after the defendant returned to Tennessee, near the end of 1996. Prior to these murders, the defendant had asked both Tackett and Tackett's wife to procure a handgun for him. On one occasion, Tackett accompanied the defendant to a pawn shop in Nashville where the defendant selected a .32 caliber revolver, but Tackett refused to purchase the weapon. Later, the defendant asked Tackett's wife to purchase a gun for him, but she also refused to do so. The defendant then made arrangements for another Shoney's employee to procure a gun for him, and he gave Tackett $200 or $300 in cash to hold for him until he met with the employee to pay for the gun. Although their co-worker successfully procured a shotgun, the defendant refused to purchase the weapon, saying that it was too large and that he needed a smaller weapon. Shortly before these murders, however, the defendant arrived unexpectedly at Tackett's house to retrieve the money Tackett was holding for him. The defendant left with the money but returned about ten minutes later with a man Tackett did not know. The defendant asked Tackett to "vouch" for him to the man. Tackett advised the unidentified man that he and the defendant were acquaintances, and the two men left together.

The defendant told Robert Bolin, from whom he purchased two .25 automatic pistols after the murders, that he had previously had a .32 caliber revolver and "didn't like the way it shot" and wanted something with a clip that held more shells. According to expert testimony, .32 caliber revolvers generally do not automatically eject bullet casings and must be manually opened after six shots to remove the cartridges and reload the weapon. As previously stated, the victims in this case were shot with a .32 caliber revolver eight times; therefore, the perpetrator would have been required to reload the weapon during the shooting.

The State also offered proof to show that the defendant, whose net pay was around $120 per week, was in financial trouble before these murders but had large sums of money, mostly cash, afterwards. Tackett described the defendant's financial situation before the murders as "desperate." The defendant and Tackett discussed making money by robbing fast food restaurants in the middle of the night, when there would be no witnesses but plenty of cash. Tackett testified that he had assumed these discussions were simply hypothetical and did not believe the defendant was being serious. The defendant was scheduled to work the day of the murders, but he called to say he would not be coming in because of car trouble. A short time after these murders, the defendant quit his job at Shoney's.

The proof showed that shortly after these murders the defendant had large amounts of cash and purchased items and paid off obligations in cash. For example, Tackett observed the defendant with $100 to $200 in five-dollar bills. When Tackett asked why he had so many five-dollar bills, the defendant replied, "just to be different." The defendant had obtained a $200 loan using his car title as collateral on

February 4, 1997, and the defendant paid this loan off in cash on February 21, 1997. On February 18, 1997, the defendant paid $2000 in cash, all in twenty-dollar bills, towards a prepaid lease on a new red Ford Escort. Two days later, he returned to the car dealership and paid off the remaining balance of the lease—$3,127.92. When the salesman asked where he had obtained this large amount of cash, the defendant replied, "Well, I've been very good at saving and my dad is going to be helping me." However, there was no proof that the defendant had a savings account. As to the defendant's checking account, the proof showed a balance of $742.61 on December 19, 1996, a balance of $134.45 on January 22, 1997, a balance of $139.95 on February 2, 1997, and a balance of $803.67 on February 27, 1997.

Bernie Billingsly and the defendant belonged to the same fitness center, and during either the last week of February or the first week of March 1997, the defendant told Billingsly that he had about $3,000 that he would like to invest and asked Billingsly for tips on stock market investing. Two to three weeks later, the defendant told Billingsly that he had read Barrons Investment Guide and had purchased a mutual fund.

After the defendant's arrest in June of 1997, the police seized four one-gallon jugs containing over $1000 in coins from his residence. The coins appeared to be layered according to their denomination. Tackett testified that he had not seen any large bottles containing coins when he helped the defendant move or when the defendant lived with him.

The defense presented the testimony of Tennessee Bureau of Investigation Agent Samera Zavaro, who said that the DNA found on cigarette butts discovered inside Captain D's did not match DNA of the defendant or the victims. The defense also attempted to undermine the prosecution's case through cross-examination. The defense vigorously cross-examined the identification witnesses, pointing out discrepancies between the defendant's appearance and the descriptions given by these witnesses and emphasizing that these identifications were suspect because these witnesses had only a brief glimpse of the man, from a substantial distance, while driving a car at thirty to forty miles per hour. In addition, the defense asked questions to show that the murder weapon was never located, that a trash can missing from the restaurant was never located, that the defendant's fingerprints were not found at the scene of the crime, that the police failed to adequately investigate the items found at the scene, such as paper, cigarette butts, and hairs located on the victims' bodies, and that the bloodhounds used by the police on Ellington Parkway stopped near a residence that did not belong to the defendant.

After hearing this proof and receiving instructions from the trial court, the jury deliberated and found the defendant guilty of premeditated and felony first degree murder as to both victims and especially aggravated robbery. In accordance with this Court's decision in *State v. Cribbs*, 967 S.W.2d 773, 787 (Tenn.1998), the trial court entered one judgment of conviction as to each victim.

## B. Sentencing Phase

The case proceeded to the sentencing hearing where the State sought the death penalty for each first degree murder conviction, relying upon three aggravating circumstances: (1) that the defendant was previously convicted of one or more felonies, other than the present charge, the statutory elements of which involve the use of violence to the person; (2) that the murder was committed for the purpose of

avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; and (3) that the murder was knowingly committed, solicited, directed, or aided by the defendant while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit robbery. Tenn.Code Ann. § 39–13–204(i)(2), (6), and (7) (1997).

In support of these aggravating circumstances, the prosecution presented the testimony of Texas assistant district attorney Brian Johnson, who had prosecuted the defendant when he was convicted of aggravated robbery in Harris County, Texas, in 1984. The parties stipulated that the offense of aggravated robbery as defined in the Texas Penal Code is a crime whose statutory elements involve the use of violence to the person, and Johnson testified that the defendant had been prosecuted and convicted of this crime. A certified copy of the judgment was entered into evidence. The State relied upon the evidence presented at the guilt phase of the trial to support the aggravating circumstances that the defendant knowingly committed the murder during a robbery and that the murder was committed for the purpose of avoiding arrest or prosecution.

The prosecution also presented victim impact evidence. The first witness was Steve Hampton's wife, Deanna Hampton, who testified that Hampton had been twenty-five when he died, that they had three children, ages three, six and eight, and that he had been a good father. Ms. Hampton testified that her husband's death had devastated her and led to her withdrawal from everyone, even her children. Both she and her children had received counseling, but Ms. Hampton testified that she would never fully recover. Steve Hampton's death had also adversely affected the couple's three children. The oldest child has withdrawn from everyone. Their youngest child associates his birthday with his father's death because the family had celebrated his birthday the night before the murder. The middle child, a daughter, often asks who will walk her down the aisle at her wedding. Ms. Hampton testified that her husband's death had also adversely affected her financial situation, which she described as "rough." Paula Sue Guidry, Steve Hampton's mother, testified about how the death of her son, her only child, had devastated her psychologically. She described their relationship as very close and said that she will never be able to get over losing him.

Several witnesses described the impact of Sarah Jackson's death on her family. Jerry Jackson, her father, testified that "part of me has died," that it is hard for him to be happy, that it is difficult for him to attend weddings and see other fathers walking their daughters down the aisle, and that his family's relationships were "broken" as a result of his daughter's death. Mr. Jackson felt guilty because he had allowed his daughter to work, and he opined that his family would never recover. He described his daughter as an intelligent girl, who had loved children. The next witness, Wayne Jackson, Sarah Jackson's older brother, told the jury that his sister's death had made him extremely angry and "hardened" his heart, that he knew she had suffered and had been afraid during the crime, and that her suffering was senseless. He further testified that he had a close relationship with his sister during childhood and said he would miss having an adult relationship with her. Finally, he described how difficult her death had been on his parents because they both felt a great deal of guilt for allowing her to work. He also testified that his sister's murder had adversely affected his younger brother, who had withdrawn and would not

talk about her death. The last witness was Gina Jackson, Sarah Jackson's mother. Ms. Jackson described her daughter as happy and fun-loving and testified that she had been killed just two days before her seventeenth birthday. Ms. Jackson also described how her daughter's death had seriously affected her younger son. Ms. Jackson, who was still undergoing counseling, also expressed how very difficult her daughter's death had been for her. She testified that she had believed her daughter would be safe working at the neighborhood Captain D's and said she often thought about how her daughter must have felt during the crime. Ms. Jackson explained that Sarah ordinarily was not allowed to work on Sunday but was allowed to work on the Sunday she was killed to earn extra money to buy a CD player for her car. Ms. Jackson related the deep feeling of guilt she had experienced as a result of allowing her daughter to work the Sunday morning she was killed. Ms. Jackson described Sarah as the most outgoing member of the family and testified that the Jackson family remembered her at family gatherings by setting out Sarah's picture, a candle, and a place setting.

The defendant presented several witnesses at sentencing: a private investigator for the defense, the defendant's older sister, a speech pathologist, a neuroradiologist and two psychologists. This testimony revealed that the defendant was born in Texas on November 12, 1957, and had two older sisters, Linda and Janet. The defendant's home life was described as unstable. His father, Paul Reid, Sr., a private investigator who repossessed cars, was an alcoholic and away from home a good deal of the time. The defendant's mother and father divorced when he was three years old. The defendant's father received custody of the defendant and his sister Janet while his sister Linda lived with his mother, who married Danny Morez, by whom she later had two more daughters. Because the defendant's father was away from home so much, the defendant and his sister Janet lived with their paternal grandmother, who had difficulty disciplining the defendant. By the age of four or five the defendant was causing problems in the neighborhood and seriously misbehaving at home. He stole mail from the neighbors, stole clothes from the neighbors' clotheslines, put tacks in his grandmother's soup, barricaded his grandmother in her room, set fire to her bed while she was in it, and beat her dog to death with a baseball bat.

Because of his father's neglect, the defendant did not start school until he was seven years old. His sister Janet testified that the defendant had a "hard time" in school. Shortly after entering school, the defendant was referred to the school psychologist and was later described as suffering from "minimal cerebral dysfunction." At the age of eight, he was sent to a Catholic school for boys in Houston, Texas, that later became the county school for neglected and dependent children. He went to live with his mother when she learned that he was going to be put up for adoption. At this time, the defendant's mother "renamed" him Paul Leon Morez because his name reminded her of her former husband. When the defendant was thirteen, his mother divorced Morez.

The defendant lived with his mother until he was sixteen. He was asked to leave after he attempted to sexually assault his sisters and his mother. After this he lived with his father sporadically but was basically on his own. In the early 1980s he married, but he was divorced in 1984. During the marriage, he had stolen city equipment to start a business. One of the defendant's sisters had warned his ex-wife not to marry him. The defendant lived

with another woman in 1994. This woman reportedly said that the defendant had a temper, had thrown her kitten across the room, and had held her down on the couch and put a pillow on her face. His sister Linda was frightened of him, and he had threatened to kill her. Janet testified that he had attempted to sexually molest her when she was a teenager and had threatened her with a knife when their grandmother died. Janet testified that her brother became paranoid after he was imprisoned in Texas. She also described how the defendant had been "joking" and acting "silly," at his father's funeral in May 1997, by wearing a Burger King crown on his head and calling himself "King Paul." He had also worn a lime green shirt, shorts, and tennis shoes to the funeral and refused to change despite repeated requests from his sisters to do so. Janet further testified that the defendant had used drugs recreationally but otherwise hated drugs.

The defendant had a juvenile record of auto theft and simple assault. Another charge of forging checks was dismissed when he paid off the checks. In 1982, he was arrested and charged with several armed robberies but was declared incompetent to stand trial and was hospitalized in Texas. Later, in 1984, he was convicted of aggravated robbery in Texas. He dropped out of school but later earned his GED and was enrolled in Volunteer State Community College at the time of his arrest.

Testimony showed that the defendant had suffered multiple head injuries during his life. When he was five, he had been hit in the head with a brick. In 1971, he fractured his skull in a mini-bike accident and was hospitalized for some time. On another occasion, his head hit the windshield of a car that struck him while he was riding his bike. At a later indefinite date he suffered another head injury when he slipped at work. Finally, in 1990, he suffered a concussion and loss of consciousness as the result of a car accident.

Patsy Casey Allen, a licensed speech and language pathologist who evaluated the defendant in 1998, testified that the defendant suffered from speech and language problems characteristic of persons with traumatic brain injuries. Allen hypothesized that these injuries were acquired rather than the result of any developmental delay.

Dr. Pamela Auble, a clinical neuropsychologist specializing in brain abnormalities, testified that she had evaluated the defendant and found evidence of brain damage, particularly in the left frontal lobe, which caused "a significant mental disorder" impairing "his behavior in a pervasive way." Dr. Auble's evaluation entailed more than eight hours of interviews over the course of a year and the administration of eighteen standardized tests. She also reviewed the defendant's medical and school records and interviewed his mother and two of his sisters. Dr. Auble noted that there had been a malformation of the defendant's left ear at birth, possibly indicating brain damage to the left temporal lobe, that the defendant's hearing was impaired in his left ear, and that he had been hyperactive since birth. Dr. Auble testified that the defendant first displayed evidence of psychosis in 1978, then again from 1982 to 1987. After his 1984 conviction for aggravated robbery, his symptoms continued, but he responded to medication. In 1987, the defendant reported delusions of being monitored by the Texas Department of Correction. He later denied any problems and received no treatment. In 1993, the defendant wrote letters to the governor of Texas, the *Washington Post*, and the citizens of Texas informing them that he had been under gov-

ernment surveillance since 1985 and that this surveillance was very costly to the taxpayers. He reported similar delusions of government surveillance to his sister, his girlfriend, and the police after his arrest in this case, and to Dr. Auble in 1998 and 1999. Dr. Auble related a history of mental illness in the defendant's family. She reported that the defendant had an IQ in the 80s and opined that the instability of his childhood environment was devastating for someone with his neurological abnormalities. Dr. Auble diagnosed the defendant as psychotic, secondary to temporal lobe damage with cognitive disorder and personality changes from brain injuries. She opined that he was not malingering and testified that he needed a structured environment. Dr. Auble admitted that the defendant met the criteria for anti-social personality disorder but felt that such a diagnosis was not helpful. Dr. Auble also agreed that neither the Minnesota Multiphasic Personality Inventory ("MMPI") nor the Rorschach personality test revealed evidence of psychosis. Dr. Auble also conceded that the defendant had a history of malingering.

Dr. Robert M. Kessler, a neuroradiologist, testified that Magnetic Resonance Imaging ("MRI") and Positron Emission Tomography ("PET") scans of the defendant's brain taken in 1998, revealed that the left side of his brain was atrophied. Dr. Kessler opined that a large portion of the defendant's left temporal lobe appeared not to be functioning properly. According to Dr. Kessler, this portion of the brain is responsible for visual and auditory processing, as well as emotional processing and memory. Dr. Kessler diagnosed the defendant as suffering abnormalities in his brain functions, likely caused by trauma to his head after the age of six or seven.

Dr. Xavier Amador, a clinical psychologist employed by Columbia University and the New York Pyschiatric Institute, conducted more than twenty hours of interviews with the defendant, interviewed the defendant's mother and sister, and reviewed all the defendant's records provided by the defense. Dr. Amador concluded that the defendant had suffered from paranoid schizophrenia, continuous type, for twenty years. Dr. Amador also diagnosed the defendant as having a cognitive disorder and personality change caused by head trauma, combined type.

Dr. Amador based his diagnosis upon the defendant's longstanding delusions about government surveillance and the defendant's medical history of repeated evaluations and treatments for some type of brain dysfunction or psychotic disorder. Dr. Amador also pointed out that the defendant had been prescribed at least eight different anti-psychotic drugs over his lifetime which, in general, improved his behavior. According to Dr. Amador, these drugs would have rendered a person without mental illness comatose.

Dr. Amador opined that the defendant's mental illness, his "broken brain," and psychological and social stressors interfaced to render him ill-equipped to deal with reality. When asked about the results of the tests administered by Dr. Auble, Dr. Amador testified that the MMPI and Rorschach tests are adjunct tools and are not the primary diagnostic tools used in clinical practice. Dr. Amador opined that during the commission of the crimes, the defendant was under the influence of his delusions.

The last witness for the defense was Reverend Joe Ingle. As a result of his pastoral relationship with the defendant and his conversations with members of the defendant's family, Reverend Ingle realized that the defendant's version of reality was "utterly contradictory" to the reality revealed by his family. As a result, he

contacted Dr. Amador and convinced him to evaluate the defendant.

In rebuttal, the State presented the testimony of Raymond Lackey, Jr., the attorney who had represented the driver of a car involved in a minor accident with the defendant's car in early 1997. Lackey testified that the defendant had done "a really fine job" representing himself in April of 1997 in the Davidson County General Sessions Court. Lackey testified that the defendant had been friendly and respectful before, during, and after the proceeding. Lackey admitted that he had only brief contact with the defendant before and during the relatively short trial and that the defendant's claim was unsuccessful.

The State also introduced evidence showing that in early 1997 the defendant had earned A's in developmental courses in English, math and study skills at Volunteer State Community College and that he was "on the way to college level classes." The State then recalled Brian Johnson, the prosecutor in the 1984 aggravated robbery case in Texas, who testified that the defendant had "performed antics" whenever the jury was in the courtroom during his competency trial, such as falling over backwards in his chair, shooting paper in the air with a rubber band, and making a paper hat and placing it on his attorney's head. The defendant had stopped "putting on" when the jury was not in the courtroom. Several months after the defendant was convicted, he wrote a letter to Johnson, apologizing for his behavior in the courtroom, stating that he felt threatened in prison, and asking Johnson for help in shortening his sentence. According to Johnson, the letter, in which the defendant offered to pass on information about other inmates, was logically written and not bizarre or unreadable.

The State's next witness was Dr. Helen Mayberg, a professor of psychiatry and neurology at the University of Toronto, who was qualified as an expert in neurology, neuropsychology and functional brain imaging. Dr. Mayberg had reviewed Dr. Kessler's MRI and PET scans and agreed that they showed evidence of abnormality restricted to the left side of the temporal lobe. Dr. Mayberg, however, opined that these abnormalities were congenital and not medically known to be associated with schizophrenia or the commission of premeditated murder.

The State's last witness was Dr. Daniel Martell, a forensic neuropsychologist. Dr. Martell interviewed the defendant over two days for about twelve hours and also reviewed all of the defendant's records and the reports from the other experts in this case. Dr. Martell concluded that the defendant suffers from a mild neurocognitive disorder, antisocial personality disorder, and a delusional disorder. Dr. Martell determined that the defendant was born with an abnormal brain leading to hearing, learning, and speech disorders. Dr. Martell was certain that the defendant met the criteria for antisocial personality disorder [2] and said that he was also probably suffering from a delusional disorder with grandiose and persecutory features that was in substantial remission. Dr. Martell further testified that these disorders had not substantially impaired the defendant's judgment or his capacity to conform his conduct to the requirements of the law or to know right from wrong. To the contrary, Dr. Martell opined that the facts of this case illustrate that the defendant had been able to effectively use his cognitive abilities to plan, execute, and cover-up his criminal actions. Dr. Martell had found the defen-

---

**2.** Antisocial personality disorder is characterized by the failure to conform to social norms, deceitfulness, irritability and aggressiveness, and lack of remorse.

dant's IQ to be between 80 and 90, a low average IQ, and said that the various tests administered to the defendant did not reveal any evidence of psychosis.

In surrebuttal, the defendant once again presented the testimony of Dr. Xavier Amador, who reiterated his diagnosis of schizophrenia and testified that the defendant was under the influence of his delusion when he killed the victims.

Based upon this proof, the jury found that the State had proven the aggravating circumstances beyond a reasonable doubt and that the aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt. Therefore, the jury sentenced the defendant to death on each conviction of first degree murder.

## II. Motion to Suppress

### A. Admissibility of Identification Testimony

The defendant filed a pre-trial motion to suppress the identification testimony of Michael Butterworth and Mark Farmer, arguing that the procedures leading to their identifications of the defendant were unduly suggestive and violated his due process rights. The trial court denied this motion. The Court of Criminal Appeals affirmed on the basis that no state action was involved in the witnesses' identification of the defendant from the television coverage. In this Court, the defendant argues that the presence or absence of state action is not dispositive, and he urges this Court to review the circumstances surrounding the witnesses' identification when determining whether due process was violated. A brief review of the circumstances surrounding these identifications is necessary to place this issue in context.

As previously stated, the record reflects that Butterworth spoke with the defendant for a few minutes on February 15, 1997, the night before the murders, when the defendant inquired about employment at Captain D's. Butterworth also worked with police to create a composite drawing of the defendant, although the drawing was not entirely consistent with the defendant's appearance. Attempting to identify the perpetrator, Butterworth looked at many police photographs, and in June of 1997, Butterworth was shown a photographic lineup that contained a photo of the defendant and five other persons. While not positively ruling out any of the persons shown, Butterworth was unable to identify anyone in the array as the man with whom he had spoken on February 15. The next day, while watching the news on television, Butterworth saw coverage of the defendant's arrest, immediately recognized the defendant, and called the police to identify him as the man he encountered at Captain D's the night before the murders. Butterworth explained that he was able to identify the defendant because, unlike the photographic lineup, the news report enabled him to hear the defendant's voice, see the way his lips moved when he talked, and see the way he walked.

As to Farmer, the record indicates that he was driving by Captain D's around 9:30 a.m. on the morning of the murders when he saw a man leave the restaurant and approach a car parked in an unusual manner at the front of the building. Farmer and the man made direct eye contact before the man looked away in a suspicious manner. After hearing about the murders, Farmer phoned the police three times to report seeing the man at the restaurant, but the police never contacted him about what he had seen. Then, in June of 1997, Farmer saw televised news coverage of the defendant's arrest, instantly recognized the defendant as the man he had seen on the morning of the murders,

and again called the police with this information.

Significant to our analysis is the undisputed fact that the police had not told either Butterworth or Farmer to watch the television news broadcasts that resulted in their identifying the defendant. Their viewing is best described as accidental, inadvertent, or coincidental. It was not orchestrated by police. To the contrary, the record reflects that police officers had advised the defendant after his arrest that he could avoid media coverage by covering his head with a jacket and by facing the wall during court proceedings so the television cameras and observers would be unable to see his face. The defendant at first indicated that he intended to follow this advice. Just before leaving the jail, however, the defendant apparently changed his mind, stating "This is going to be the Paul Reid trial." Therefore, the defendant did not cover his head, and he turned around and faced everyone in the courtroom during the arraignment. Thus, the defendant's decision to make it a "Paul Reid trial," rather than state action, led directly to Butterworth's and Farmer's identification testimony.

 While this Court has not previously addressed this issue, it is well-settled Tennessee law that in the absence of state action in the identification process, constitutional due process rights are not implicated; therefore, the analysis adopted by the United States Supreme Court in *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) is not appropriate in this case. *See, e.g., State v. Drinkard*, 909 S.W.2d 13, 15–16 (Tenn.Crim.App.), *perm. app. denied* (Tenn.1995) (refusing to find the identification unduly suggestive and violative of due process because the police did not arrange the confrontation between the defendant and the witness) (citing cases); *State v. Newsome*, 744 S.W.2d 911,

917 (Tenn.Crim.App.), *perm. app. denied* (Tenn.1987) (refusing to find the identification unduly suggestive and violative of due process because the police did not arrange the encounter between the defendant and the victim); *State v. Dixon*, 656 S.W.2d 49, 51 (Tenn.Crim.App.), *perm. app. denied* (Tenn.1983) (refusing to find the identification unduly suggestive and violative of due process because a confrontation between the defendant and the victim was not a showup arranged by the police); *State v. Mosby*, 639 S.W.2d 672, 673 (Tenn.Crim. App.), *perm. app. denied* (Tenn.1982) (refusing to find the identification unduly suggestive and violative of due process because there was no state action where the victim identified the defendant after a neighbor showed the victim a single photograph); *Bishop v. State*, 582 S.W.2d 86, 91 (Tenn.Crim.App.1979) (refusing to find the identification unduly suggestive and violative of due process because there was no state action where a witness first identified the defendant from a single picture in a local newspaper). Moreover, in so holding, the law in Tennessee is consistent with the rule adopted by a majority of jurisdictions that have considered this issue. *See generally* Annotation, "Admissibility of In-Court Identification As Affected by Pre-Trial Encounter That Was Not Result of Action by Police, Prosecutors, and the Like," 86 A.L.R. 5th 463 (2001) (citing cases). In a scholarly opinion, the Rhode Island Supreme Court explained why a broader rule is unnecessary:

[W]e conclude that absent state action, no constitutional violation that would give rise to the creation of an exclusionary rule has been committed.

\* \* \*

Probably the best guarantee of due process in such a situation as that presented by the case at bar would be the opportunity for cross-examination in or-

der to expose the witness's lack of credibility. This opportunity is further buttressed and enforced by the requirement that the state prove every element of the crime, including the identity of the accused beyond a reasonable doubt. The guarantee is also supported not only by the requirement of a unanimous jury verdict but also by the power of the trial justice to review the evidence, including credibility, on a motion for new trial.

Thus, the due-process rights of defendant in this case, as in all criminal cases, are adequately protected from violations of due process without the fashioning of additional exclusionary rules, whether pursuant to the Federal or the Rhode Island Constitution.

*State v. Pailon,* 590 A.2d 858, 863 (R.I. 1991).

This case well illustrates the soundness of the Rhode Island Supreme Court's analysis. Here, the trial court scrupulously applied the rules of evidence which admit only relevant evidence that is not unduly prejudicial or misleading. The defendant's attorneys effectively cross-examined these witnesses, focusing upon the weaknesses in their identifications. The trial court properly instructed the jury as to eyewitness testimony, in accordance with this Court's decision in *State v. Dyle,* 899 S.W.2d 607, 612 (Tenn.1995). The jury's verdicts of guilt were unanimous, and the trial court approved these verdicts as the thirteenth juror. Like the Rhode Island Supreme Court, we conclude that the due process rights of criminal defendants are quite adequately protected by existing rules and procedures. Absent evidence of state involvement in Butterworth's and Farmer's identifications of the defendant, constitutional due process is not implicated, and the analysis adopted by the United States Supreme Court in *Neil* is not applicable.

The identification testimony was properly admitted. This issue is without merit.

## B. Validity of Search Warrants

The defendant next argues that the trial court and Court of Criminal Appeals erred by refusing to suppress certain evidence seized from his residence under the authority of two search warrants—Warrants 146 and 149. The defendant argues that both warrants were invalid because the items seized were not particularly described in the warrants, the affidavits to each warrant do not demonstrate a nexus between the criminal activity and the place to be searched, and the police failed to personally deliver copies of the warrants to the defendant in violation of Tennessee Rule of Criminal Procedure 41(c). Additionally, the defendant contends that Warrant 149 was invalid because the affidavit was not expressly incorporated by reference into the warrant.

Under both the Fourth Amendment to the United States Constitution and Article I, section 7 of the Tennessee Constitution a search warrant must contain a particular description of the items to be seized. *See State v. Henning,* 975 S.W.2d 290, 296 (Tenn.1998) (citing cases). This requirement serves as a limitation, both upon governmental intrusion into a citizen's privacy and property rights and upon the discretion of law enforcement officers conducting the search. *Id.* To satisfy the particularity requirement, a warrant "must enable the searcher to reasonably ascertain and identify the things which are authorized to be seized." *Henning,* 975 S.W.2d at 296 (internal quotations and citations omitted). This Court has stated:

> where the purpose of the search is to find specific property, it should be so particularly described as to preclude the possibility of seizing any other. On the

other hand, if the purpose be to seize not specified property, but any property of a specified character which, by reason of its character, and of the place where and the circumstances under which it may be found, if found at all, would be illicit, a description, save as to such character, place and circumstances, would be unnecessary, and ordinarily impossible.

*Lea v. State,* 181 Tenn. 378, 181 S.W.2d 351, 352–53 (1944); *see also Henning,* 975 S.W.2d at 296.

■ Applying these well-settled principles to the facts in this case, we note that Warrants 146 and 149 authorized searches of the defendant's residence for items "which may be identified" as property belonging to the victims or the restaurants,[3] and any items that "may be used to cause the death of the victims." Warrant 149 additionally authorized a search for "any and all financial records to include those indicating" money paid by the defendant on an automobile lease around the time of the murders.[4] An affidavit was attached to each warrant, setting forth the nature and circumstances of the crimes and noting several items that had been taken from the restaurants, including bank bags.

We agree with the trial court and the Court of Criminal Appeals that, as in *Lea,* the purpose of the search was not to find specific property, but to find property of a specific character, i.e., items that may have

been taken from the restaurants and the victims, murder weapons, and financial records. Providing a description of everything which may have been taken from the victims and the restaurants was not possible. Nonetheless, the warrants described the character of the property with sufficient particularity "to enable the searcher to reasonably ascertain and identify" the items subject to seizure. *Henning,* 975 S.W.2d at 296. Therefore, these descriptions satisfy the particularity requirement.

■ Finally, the plain view doctrine authorizes officers conducting a lawful search to seize contraband, fruit of the crime, or evidence of criminal conduct even though it is not specified in a warrant when these items are in plain view. *See, e.g., State v. Meeks,* 867 S.W.2d 361, 373 (Tenn.Crim. App.), *perm. app. denied* (Tenn.1993). In this case, the Court of Criminal Appeals properly held that the officers were entitled to seize the jars of coins, shoes, hats, knives, photographs, and other items under the plain view doctrine because these items were in plain view and the officers justifiably considered these items to be contraband, or fruits of the crime, or evidence of criminal conduct. This issue is without merit.

■ The defendant further argues that, because the crimes had been committed several months before the warrants were issued in June of 1997, the information in the affidavits was too stale to establish a

---

3. At the time of this investigation, the defendant was also under investigation for the murders, robbery and assault of employees of a Nashville McDonald's restaurant.

4. Law enforcement officers executed seven search warrants, and the defense challenged all of these warrants in pretrial motions. The State, however, gave notice prior to trial that it did not intend to introduce the evidence seized pursuant to the other five warrants. Thus, on appeal, the defendant challenges the validity of only Warrants 146 and 149 and the

evidence that was seized under the authority of these and admitted at trial. Officers executing Warrant 146 seized four jars of coins, six pairs of shoes, one duffle bag, one brown carry bag, assorted photographs, one Bible, three knives, and three hats. Officers executing Warrant 149 seized a box of photograph albums, a bag containing photographs and negatives, a bag of assorted letters and mail, women's toiletry items, keys, teeth molds, and assorted magazines, papers, and notes.

nexus between the crime and the place to be searched. The defendant also contends that the affidavits do not indicate that the police had probable cause to believe that evidence of the crimes would be located at the defendant's residence.

 To establish probable cause an affidavit must set forth facts from which a reasonable conclusion may be drawn that the evidence will be found in the place for which the warrant authorizes a search. *State v. Vann,* 976 S.W.2d 93, 105 (Tenn. 1998); *State v. Longstreet,* 619 S.W.2d 97, 99 (Tenn.1981). In addition, the affidavit must contain information which will allow a magistrate to determine whether the facts are too stale to establish probable cause at the time issuance of the warrant is sought. *Vann,* 976 S.W.2d at 105. While the lapse of time between the commission of a crime and the issuance of a search warrant may affect the likelihood that incriminating evidence will be found, probable cause is a case-by-case determination. *State v. Meeks,* 876 S.W.2d 121, 124 (Tenn.Crim. App.), *perm. app. denied* (Tenn.1993). In making this determination, courts should consider whether the criminal activity under investigation was an isolated event or a protracted pattern of conduct. Courts also should consider the nature of the property sought, the normal inferences as to where a criminal would hide the evidence, and the perpetrator's opportunity to dispose of incriminating evidence. *State v. Dellinger,* 79 S.W.3d 458, 469–70 (Tenn. 2002); *State v. Smith,* 868 S.W.2d 561, 572 (Tenn.1993).

In this case, the criminal conduct under investigation was not an isolated event. As indicated in the warrants, the crimes occurred almost one month apart, with the last crime committed on March 23, 1997, less than three months prior to the time the warrants were being sought. The warrants sought any items that had been taken from the restaurants or the victims or that may have been used to cause the death of the victims. The affidavits set out the circumstances of the Captain D's and McDonald's robberies, including the fact that the only person who had survived the crimes had been repeatedly stabbed and left for dead. The affidavits further noted that the defendant's fingerprint had been recovered from an item belonging to one of the Captain D's victims, that the murder scenes were extremely bloody, that the victims' blood could be on the defendant's clothing, and that the defendant could still have in his possession or on his premises instruments of violence used to murder the victims or personal items belonging to the victims. Clearly, the affidavits provide an explanation for why the items sought by the warrants are capable of, and are in fact, likely to be hidden in the defendant's residence. As this Court explained in *Smith,*

> where the object of the search is a weapon used in the crime or clothing worn at the time of the crime, the inference that the items are at the offender's residence is especially compelling, at least in those cases where the perpetrator is unaware that the victim has been able to identify him to the police. Other instrumentalities are also likely to be in the offender's home, especially when there is reason to believe he would make use of them there.

868 S.W.2d at 572. Where, as here, a perpetrator believes he has eliminated or incapacitated all witnesses so that law enforcement officials are unlikely to discover his criminal activity, it is neither unreasonable nor unlikely that the perpetrator would keep clothing, or the murder weapons, or items taken during the crime at his residence. *See Smith,* 868 S.W.2d at 572. Therefore, we conclude that the trial court and Court of Criminal Appeals correctly

found that the affidavits set forth sufficient facts from which the magistrate reasonably could have concluded that a nexus existed between the crime and the place to be searched and that the facts were sufficiently recent to establish probable cause.

▮ The defendant next claims that the trial court and Court of Criminal Appeals should have held the warrants invalid because the officers executing the warrants failed to personally deliver a copy of the warrants to him at the Cheatham County Jail as required by Tennessee Rule of Criminal Procedure 41(c).[5] We disagree.

It is undisputed that the officers executing the warrants were aware of the defendant's whereabouts. It is also undisputed that the detectives left a copy of the search warrant locked inside the defendant's residence, from which the property was taken. The rule requires nothing more. In pertinent part, Rule 41 provides:

> [T]he failure of the serving officer *where possible to leave a copy with the person or persons on whom the search warrant is being served,* shall make any search conducted under said search warrant an illegal search and any seizure thereunder an illegal seizure.

(Emphasis added.) As the Court of Criminal Appeals noted, there was no one present on whom the officers could serve the warrant at the time it was executed; therefore, *it was not possible* for the officers to leave a copy with the person being served. Rule 41(c) does not require officers to deliver a copy of the search warrant to a person who is not present. Instead, subsection (d) of Rule 41 indicates that an officer taking property under a warrant shall "give to the person from whom or from whose premises the proper-

ty was taken a copy of the warrant and a receipt for the property taken *or shall leave the copy and receipt at a place from which the property was taken."* (Emphasis added.) In this case, the officers left the warrant at the defendant's residence, the place from which the property was taken. This issue is without merit.

▮ Lastly, the defendant contends that Warrant 149 is invalid because, unlike Warrant 146, it does not expressly incorporate by reference the affidavit of probable cause. Again, we are constrained to disagree. While an affidavit is an indispensable prerequisite to the issuance of a search warrant, an affidavit is not considered part of the warrant in this State. *Henning,* 975 S.W.2d at 296. There is no statute or rule requiring that a warrant expressly incorporate by reference the probable-cause affidavit. Therefore, the mere failure to incorporate the affidavit does not render the warrant invalid. This issue is without merit.

### III. Sufficiency of the Evidence

The defendant next asserts that the evidence presented is insufficient to support his convictions because the State failed to prove beyond a reasonable doubt his identity as the perpetrator of the crimes.

▮ The proper inquiry for an appellate court reviewing a challenge to the sufficiency of the evidence to support a conviction is whether, considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Hall,* 8 S.W.3d 593, 599 (Tenn.1999); Tenn.

---

**5.** As previously noted, the defendant's incarceration in the Cheatham County Jail stemmed from another incident where he allegedly attempted to kidnap the manager of a Shoney's restaurant.

R.App. P. 13(e). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn.1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court does not re-weigh or re-evaluate the evidence. *Id.* Nor may this Court substitute its inferences drawn from circumstantial evidence for those drawn by the trier of fact. *See State v. Carruthers,* 35 S.W.3d 516, 557–58 (Tenn.2000); *Liakas v. State,* 199 Tenn. 298, 286 S.W.2d 856, 859 (1956). A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." *State v. Smith,* 868 S.W.2d 561, 569 (Tenn.1993), quoting *State v. Duncan,* 698 S.W.2d 63, 67 (Tenn.1985). A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, and on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the verdict rendered by the jury. *Carruthers,* 35 S.W.3d at 557–58; *State v. Tuggle,* 639 S.W.2d 913, 914 (Tenn.1982). In contrast, the State on appeal is entitled to the strongest legitimate view of the trial evidence and all reasonable and legitimate inferences which may be drawn from the evidence. *See Carruthers,* 35 S.W.3d at 557–58; *Hall,* 8 S.W.3d at 599; *Bland,* 958 S.W.2d at 659. The standard of appellate review is the same whether the conviction is based upon direct or circumstantial evidence. *Carruthers,* 35 S.W.3d at 557–58; *Vann,* 976 S.W.2d at 111.

■ Briefly summarized, the record reflects that prior to this crime the defendant had discussed robbing fast food restaurants with co-workers as a way to obtain more money, that he had worked at a Shoney's near the scene of the crime, that he had obtained a job application the night before the murders from a Captain D's employee who informed him to come back the next afternoon to speak with manager, Steve Hampton, and that he asked this employee whether anyone would be at the restaurant the following morning. The defendant also had asked a friend to help him obtain a .32 caliber revolver prior to the crimes. The victims were shot a total of eight times with a .32 caliber weapon, probably a revolver, which had to be manually reloaded after six shots. After these crimes, the defendant told a man from whom he was purchasing a .25 automatic pistol that he previously had a .32 caliber revolver but did not like the way it shot and wanted something that had a clip to hold more bullets. Two witnesses placed the defendant and his vehicle outside Captain D's on the morning of the murders. Another witness saw a man matching the defendant's appearance standing at the door of Captain D's talking to Steve Hampton on the morning of the murders and said this unidentified man had white paper in his hand. Although the defendant had been experiencing serious financial trouble prior to the crime, the proof showed that he spent over $6,000 in cash within two weeks of the crime. Police found $1,000 in coins at the defendant's residence a few months after this crime. The total amount of cash and coins taken from Captain D's during the robbery was $7,140. The defendant's fingerprint was found on a movie rental card belonging to one of the victims, which was discovered the day after the murders discarded on a road only 1.2 miles from the defendant's home. Shoe prints found inside Captain D's were consistent in length with shoes seized from the defendant's residence. Al-

though the tread patterns did not match shoes seized from the defendant's home, a photograph of the defendant showed him wearing a pair of dingy white tennis shoes that police did not find. One witness who identified the defendant as the man leaving Captain D's on the morning of the murders said he was wearing "not new" white tennis shoes. Considering the proof in the record in the light most favorable to the State, we conclude that the proof points the finger of guilt unerringly at the defendant and the defendant alone. Therefore, the defendant's challenge to the sufficiency of the evidence is without merit.

### IV. Improper Cross–Examination of Janet Kirkpatrick

Prior to trial, the defense team interviewed the defendant's sisters. A summary of the joint interview was provided to the defense experts, the State's experts, and the prosecuting attorneys. During the penalty phase of the trial, one of the defendant's sisters, Janet Kirkpatrick, testified on his behalf. On direct, Kirkpatrick discussed much of the information contained in the summary of the joint interview, and she acknowledged that the defendant had been previously incarcerated. Before cross-examining Kirkpatrick, the prosecuting attorneys approached the bench and stated their intent to impeach Kirkpatrick's testimony by questioning her about information in the interview summary detrimental to the defense that was not brought out during direct. Defense counsel did not object to this line of inquiry at the bench conference even though, as the trial court found, they were "fully aware of the contents of that interview, including the underlying facts of the previous robbery."

Against this backdrop, the assistant district attorney during cross-examination asked Kirkpatrick whether she "was aware that during an attempt to rob a restaurant, [the defendant] was putting one of the victims in the freezer when the victim—." [6] Defense counsel objected, and the trial court held a jury-out hearing at which Kirkpatrick denied making this statement during the interview. Rather, Kirkpatrick indicated that her sister had made the statement based upon a newspaper article her sister had read. Although she agreed that the interview summary suggested that both sisters had knowledge of the incident, Kirkpatrick maintained that she had no personal knowledge of the facts of the crime and had merely agreed with her sister. Following this testimony, defense counsel moved for a mistrial. The trial court sustained defense counsel's objection to the question but denied the defendant's request for a mistrial.

In addition, when the jury returned to the courtroom, the trial court provided the following curative instruction:

> Ladies and gentlemen of the jury, before you went upstairs for your afternoon break, General Thurman had asked a question of this witness. I sustained an objection, and that information is now stricken from the record. You may not consider that for any reason, and you must treat it as if you had never known it.
>
> Again, I remind you that you may not consider allegations of criminal behavior or prior crimes with regard, that you've been hearing this afternoon, except as to how it relates to the mental health of the defendant. The State is relying upon the prior conviction for its aggravating

---

**6.** This incident occurred in Texas and resulted in the defendant's arrest and conviction for robbery.

circumstance involving the robbery charge that was committed on the dates on the certified copy, and you may not consider other crimes or other criminal behavior for any reason, other than the mental condition of the defendant.

██ Despite this instruction, the defendant submits that the trial court erred in refusing to grant a mistrial. He argues that the prosecutor's question informed the jury that the defendant had previously attempted to commit a crime under circumstances almost identical to these crimes, and therefore, was so prejudicial that the trial court's curative instruction could not remove its effect. The State responds that the trial court properly denied the defendant's request for a mistrial. The law is well-settled that the decision of whether or not to enter a mistrial rests within the sound discretion of the trial court. This Court will not interfere with the trial court's decision absent a clear abuse of discretion on the record. *See State v. Adkins*, 786 S.W.2d 642, 644 (Tenn.1990); *State v. Inlow*, 52 S.W.3d 101, 105 (Tenn.Crim.App.2000).

The record in this case shows no abuse of discretion. The question about which the defendant complains was posed during the sentencing hearing. The jury had already found the defendant guilty of committing these murders; therefore, any prejudice associated with the question was minimized by its timing. The defense team did not object to this line of questioning at the bench conference. Once an objection was made, the trial court immediately considered the issue at a jury-out hearing. Moreover, before the prosecution posed this question, the defense team, attempting to illustrate the defendant's mental problems, had presented extensive evidence regarding the defendant's involvement in other crimes. In addition, the State had presented proof of the defendant's previous violent felony conviction to support the (i)(2) aggravating circumstance. The jury therefore had been informed prior to this question by both prosecution and defense proof that the defendant had a prior criminal record. The question provided little new information to the jury, and the trial court immediately sustained the objection and instructed the jury not to consider the question "for any reason" and to "treat it as if you had never known it." In addition, the trial court advised the jury not to "consider other crimes or other criminal behavior for any reason, other than the mental condition of the defendant." Jurors are presumed to follow the instructions of the trial court. *State v. Stout*, 46 S.W.3d 689, 715 (Tenn.2001); *State v. Williams*, 977 S.W.2d 101, 106 (Tenn.1998). Under these circumstances, the trial court did not abuse its discretion by denying the defendant's request for a mistrial. This issue is without merit.

## V. Alleged Errors Relating to Victim Impact Evidence and Argument

██ The defendant next contends that admission of victim impact evidence under the guidelines of *State v. Nesbit*, 978 S.W.2d 872 (Tenn.1998), infringed upon his right to be free from ex post facto laws and violated this Court's decision in *State v. Smith*, 893 S.W.2d 908, 919 (Tenn.1994), holding that capital sentencing proceedings must be conducted in accordance with the law in effect at the time the offense is committed. The defendant argues that under the law in effect in 1997, when these offenses were committed, victim impact evidence was not admissible because this Court had held in *Cozzolino v. State*, 584 S.W.2d 765, 768 (Tenn.1979), that evidence was admissible at a capital sentencing hearing only if it was relevant to an aggravating circumstance or to a mitigating circumstance raised by the defendant.

Initially we note that the Ex Post Facto Clause does not by its own terms apply to judicial decisions. *See generally* U.S. Const. Art. 1, §§ 9 and 10; Tenn. Const. Art. I, § 11; *Rogers v. Tennessee*, 532 U.S. 451, 456, 121 S.Ct. 1693, 1699, 149 L.Ed.2d 697 (2001). To the extent that due process protects interests similar to those protected by the Ex Post Facto Clauses of the state and federal constitutions, retroactive application of an alteration of a common law doctrine of criminal law violates due process only where the alteration is "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue." *Rogers*, 532 U.S. at 461, 121 S.Ct. at 1700. A review of *Nesbit* immediately reveals that the decision did not alter a common law doctrine of criminal law or apply a new interpretation to the capital sentencing statute.

In *Nesbit*, this Court held that victim impact evidence and argument is not barred by the federal or state constitution. 978 S.W.2d at 889; *see also Payne v. Tennessee*, 501 U.S. 808, 827, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720 (1991) (holding that the Eighth Amendment erects no *per se* bar against the admission of victim impact evidence and prosecutorial argument). This Court further stated that Tennessee Code Annotated section 39–13–204(c)(1997)

> enables the sentencing jury to be informed about the presence of statutory aggravating circumstances, the presence of mitigating circumstances, and the nature and circumstances of the crime. The statute allows the sentencing jury to be reminded "that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family."

*Nesbit*, 978 S.W.2d at 890 (quoting *Payne*, 501 U.S. at 825, 111 S.Ct. at 2608). In so stating, this Court expressly rejected the interpretation of *Cozzolino* now advanced by the defendant, and pointed to many prior decisions admitting evidence about the nature and circumstances of the crime, even though such proof is not necessarily related to a statutory aggravating circumstance, and emphasized that victim impact evidence is encompassed within the statutory language "nature and circumstances of the crime." *Nesbit*, 978 S.W.2d at 890. While the decision in *Nesbit* expressly clarified existing practice in Tennessee relating to victim impact evidence, the decision did not change existing law. The defendant's sentencing hearing was conducted pursuant to the statute discussed in *Nesbit;* therefore the defendant's assertion that admitting victim impact evidence constituted an ex post facto violation is without merit.

The defendant next asserts that the victim impact testimony in this case exceeded the scope of permissible victim impact testimony established by *Nesbit.* Although victim impact evidence is admissible, such evidence generally should be "limited to information designed to show those unique characteristics which provide a brief glimpse into the life of the individual who has been killed, the contemporaneous and prospective circumstances surrounding the individual's death, and how those circumstances financially, emotionally, psychologically or physically impacted upon members of the victim's immediate family." *Nesbit*, 978 S.W.2d at 891. Victim impact evidence may not be introduced if it is so unduly prejudicial that it renders the trial fundamentally unfair or its probative value is substantially outweighed by its prejudicial impact. *See Nesbit*, 978 S.W.2d at 891 (citations omitted). To enable the trial court to adequately supervise the admission of this evidence and ensure that it is properly limited: (1) the State must notify the trial

court of its intent to introduce victim impact evidence; (2) the trial court must then hold a jury-out hearing to determine the admissibility of the evidence; and (3) the evidence should not be admitted until the trial court determines that evidence of one or more aggravating circumstances is already present in the record. *Nesbit*, 978 S.W.2d at 891.

The trial court in this case meticulously followed these procedural safeguards before admitting the testimony of Steve Hampton's wife and mother and the testimony of Sarah Jackson's parents and older brother. This testimony has previously been thoroughly recited and need not be reiterated here. The defendant maintains that the trial court should have excluded certain portions of this testimony, including the testimony of Gina and Wayne Jackson regarding Sarah Jackson's suffering and fear at the time of the crimes; the testimony of Gina Jackson that she thought that her daughter was safe while working at Captain D's; the testimony of Deanna Hampton that her daughter asked who would walk her down the aisle at her wedding; the testimony of Jerry Jackson about how difficult it was for him to see other fathers march the bride down the aisle; the testimony about how the Jackson family set out Sarah's picture, a candle, and a place setting for her at family gatherings; and the testimony about how the Jackson family felt guilty about Sarah's death and "allocated fault" among themselves.

The defendant also complains that the victim impact evidence presented was different from the evidence approved by the trial court at the jury-out hearing. Specifically, he points to Deanna Hampton's testimony about the effect of her husband's death on her son's birthday celebration and her husband's character as a good father, Jerry Jackson's testimony about how Sarah and her family were robbed of her potential and "money is money" but "you can't replace" someone's life, and Wayne Jackson's testimony about his opinion of the crime and his sister's fear and suffering. The defendant says that this evidence rendered the sentencing hearing fundamentally unfair and that, even if individual portions of the testimony alone do not warrant reversal, the cumulative prejudicial effect of this testimony mandates reversal. We disagree.

As stated, "victim impact evidence should be limited to information designed to show those unique characteristics which provide a brief glimpse into the life of the individual who has been killed, the contemporaneous and prospective circumstances surrounding the individual's death, and how those circumstances financially, emotionally, psychologically or physically impacted upon members of the victim's immediate family." *Nesbit*, 978 S.W.2d at 891 (citations omitted). The testimony about which the defendant complains is well within these parameters. Most of this testimony demonstrated how the contemporaneous circumstances surrounding the victims' deaths had psychologically affected their immediate family members. While the testimony was not word-for-word the same, the Court of Criminal Appeals correctly noted that the testimony offered before the jury did not differ in kind or scope from that offered at the jury-out hearing. The victim impact evidence complained of by the defendant was not unduly prejudicial and clearly falls within the parameters established in *Nesbit*. See generally *State v. Austin*, 87 S.W.3d 447 (Tenn.2002); *State v. Stevens*, 78 S.W.3d 817, 828 (Tenn.2002); *State v. McKinney*, 74 S.W.3d 291, 309–10 (Tenn. 2002); *Smith*, 993 S.W.2d at 17.

Moreover, nothing in the record indicates that admission of this evidence ren-

dered the sentencing hearing fundamentally unfair. As previously stated, the trial court scrupulously followed the dictates of *Nesbit* and, with respect to the conduct of the victims' families during this proceeding, stated:

> The victims' family members were present during the pretrial hearings, the trial, and portions of jury selection. Despite the trauma they suffered when their loved ones were senselessly murdered, they showed the utmost respect for the judicial process at all times.

While "a few of the jurors shed tears during portions of the victim impact testimony," the trial court noted "none of the jurors became overly emotional. They simply demonstrated a normal reaction to [such] testimony." After thoroughly reviewing the record, we agree with the trial court and the Court of Criminal Appeals that the victim impact evidence was not unduly prejudicial and did not render the sentencing proceeding fundamentally unfair.

Next, the defendant avers that a contradiction exists between Tennessee Code Annotated section 39–13–204(g)(1) and the jury instruction regarding victim impact evidence set out by this Court in *Nesbit*. The defendant maintains that this contradiction renders victim impact evidence irrelevant. Tennessee Code Annotated section 39–13–204(g)(1) provides in pertinent part:

> If the jury unanimously determines that
> (A) At least one (1) statutory aggravating circumstance or several statutory aggravating circumstances have been proven by the state beyond a reasonable doubt; and
> (B) Such circumstance or circumstances have been proven by the state to outweigh any mitigating circumstances beyond a reasonable doubt; then the sentence shall be death.

The jury instruction set out by this Court in *Nesbit* is as follows:

> The prosecution has introduced what is known as victim impact evidence. This evidence has been introduced to show the financial, emotional, psychological, or physical effects of the victim's death on the members of the victim's immediate family. You may consider this evidence in determining an appropriate punishment. However, your consideration must be limited to a rational inquiry into the culpability of the defendant, not an emotional response to the evidence.
>
> Victim impact evidence is not the same as an aggravating circumstance. Proof of an adverse impact on the victim's family is not proof of an aggravating circumstance. Introduction of victim impact evidence in no way relieves the State of its burden to prove beyond a reasonable doubt at least one aggravating circumstance which has been alleged. *You may consider this victim impact evidence in determining the appropriateness of the death penalty only if you first find that the existence of one or more aggravating circumstances has been proven beyond a reasonable doubt by evidence independent from the victim impact evidence, and find that the aggravating circumstances found outweigh the finding of one or more mitigating circumstances beyond a reasonable doubt.*

*Nesbit*, 978 S.W.2d at 892 (emphasis added). The defendant says a contradiction exists because the statute provides that the jury *shall* return a verdict of death upon finding the existence of an aggravating circumstance beyond a reasonable doubt that outweighs any mitigating circumstances beyond a reasonable doubt, while the *Nesbit* instruction allows the jury to consider victim impact evidence only after it has found that at least one aggra-

vating circumstance exists, and that the aggravating circumstance outweighs the mitigating circumstances beyond a reasonable doubt. The defendant concludes that victim impact evidence is "mooted" by the instruction and serves no purpose in the sentencing scheme.

Assuming, for the sake of argument, that the defendant is correct, he certainly has no basis to complain because, as the State points out, any contradiction between the statute and the instruction inures to his benefit. *See, e.g., Smith,* 993 S.W.2d at 13, n. 7; *State v. Bush,* 942 S.W.2d 489, 506, n. 10 (Tenn.1997); *State v. Carter,* 714 S.W.2d 241 (Tenn.1986). Therefore, this complaint does not entitle the defendant to relief.

During oral argument, the State indicated that it is not opposed to this Court reconsidering the *Nesbit* instruction and stated that the portion of the instruction challenged by the defendant unnecessarily limits the jury's consideration of victim impact evidence. Although the State's brief includes no discussion of the instructions used by other jurisdictions, at oral argument the State indicated that some jurisdictions do not provide a jury instruction on victim impact evidence and other jurisdictions take a "minimalist" approach by simply advising the jury that victim impact evidence is not an aggravating circumstance.

 It is beyond dispute that any effective instruction on this subject must advise the jury that victim impact evidence is not the same as an aggravating circumstance. As to the instructions used by other jurisdictions, we note that the *Nesbit* instruction was based upon precedent from other jurisdictions, in particular Oklahoma

and Georgia.[7] Nevertheless, we wish to emphasize that the *Nesbit* instruction was simply a suggestion. *Nesbit,* 978 S.W.2d at 892 ("[W]e hereby suggest the following instruction. . . ."). By suggesting this language we did not intend to preclude individual trial judges or the Committee on Pattern Jury Instructions (Criminal) of the Tennessee Judicial Conference ("Committee") from making necessary and appropriate revisions to this instruction. Indeed, trial judges and the Committee, which is composed of trial judges, are often better situated to assess the practical effectiveness or ineffectiveness of this particular instruction and make needed language changes.[8]

The defendant also complains that the prosecutors engaged in improper closing argument regarding the function of victim impact evidence and argues that the trial court erred by failing to grant a mistrial based upon this improper argument. As previously stated, the decision of whether to grant a mistrial is within the sound discretion of the trial court, and the trial court's decision will not be reversed absent a clear showing of abuse of discretion. *Adkins,* 786 S.W.2d at 644; *Inlow,* 52 S.W.3d at 105.

 As the State asserts, the defendant failed to contemporaneously object to the prosecutor's argument that the jury should consider what the victim's death "meant to the community" and that the jury should "show [the defendant] the same mercy that he showed to Steve and Sarah." Despite defense counsel's failure to object, the trial court provided a curative instruction, stating, "Ladies and Gentlemen of the Jury, you are to do an

---

**7.** *Nesbit,* 978 S.W.2d at 892 (citing cases).

**8.** Both the defense and the State are urged to submit concerns and suggestions regarding

this instruction to the Committee for its consideration.

individualized sentencing based on the law and facts with regard to the case and Mr. Reid. You are to do so without regard to the effect on the community." The defendant's failure to object to these comments constitutes waiver on appeal. *See State v. Green,* 947 S.W.2d 186, 188 (Tenn.Crim. App.1997); *State v. Little,* 854 S.W.2d 643, 651 (Tenn.Crim.App.1992) (failure to object to prosecutor's alleged misconduct during closing argument waives later complaint); *State v. Thornton,* 10 S.W.3d 229, 234 (Tenn.Crim.App.1999) (citing Tenn. R.App. P. 36(a)). Moreover, a review of the record clearly indicates that these comments do not amount to plain error. In light of the limited nature of the comments and the trial court's curative instruction, any error was harmless. *See State v. Burns,* 979 S.W.2d 276, 283 (Tenn. 1998) (finding more extensive argument harmless error).

■ The defendant also contends that during rebuttal argument the prosecutor improperly told the jury that it could consider the victim impact evidence during the weighing process and engaged in inflammatory argument designed to elicit an irrational and emotional response from the jury. The defendant contends that the cumulative effect of this improper argument mandates reversal. The following is an excerpt of the argument to which the defendant objects:

GENERAL THURMAN: Aggravating circumstances. We've talked about those. General Moore talked about them, and they are really not an issue. Mr. Engle admits that all those aggravating circumstances are present in this case, so that is not the issue now. Now you have the weighing issue, and if you weigh what we've talked about, if you weigh it, any mitigation you found for Mr. Reid, and I submit it is very slight, I think there is but one verdict under the law. You weigh it in your mind. What is the verdict? When you weigh it, I want you to consider the facts about these aggravating circumstances, the facts that this is a robbery, the facts that they were killed in cold blood because they were witnesses. You've seen that picture a lot, but when you weigh the circumstances of this crime, you have to think what was in Steve Hampton's mind, when he was shot and when he was still alive and was reaching up? What was he thinking in the last few seconds? And you weigh that against the mitigation. Sarah Jackson—

MR. ENGLE: Objection, Your Honor, you cannot, the law doesn't allow the weighing of the facts of the crimes as against the mitigating evidence.

THE COURT: Sustained. Rephrase.

GENERAL THURMAN: They can consider all the facts and circumstances of the crime, which I'm asking.

THE COURT: They can consider. I will—ladies and gentlemen of the jury, I will instruct you as to how you are to weigh things.

GENERAL THURMAN: But you can consider that. You consider what Sarah Jackson had to go through in considering these aggravating factors, after she was shot, after she had to wait knowing Steve Hampton was being shot, and she was next, and how after she was shot, she was struggling to get up, thinking maybe, maybe I've survived, maybe he is gone, and when you are weighing his background, his childhood, weigh what kind of man could stand there and calmly reload, one shell at a time, in that pistol while she is struggling there, and what kind of man cannot have pity, and what kind of man did walk in there and execute that young girl?

This kind of man, and he can't blame his mother. He can't blame his father. He

can't blame the Texas Department of Correction. He is responsible. This man. That is the man the expert witnesses for the defense didn't want you to see. That is the man that suffered from this psychosis that can't hardly deal with the world. That is the man. Paul Reid celebrating, spending his money, shopping. It looks like he is functioning pretty well; doesn't it? While he is toasting his margarita and you are weighing the circumstances, think about the three children that are saying where is my daddy? Think about the parents struggling to get through one more day while he is celebrating.

Now even though a lot of this case is about Paul Reid and the mitigation that you have to consider, you don't have to forget those faces, those lives, and the lives that were destroyed, besides those two, of the families. The Judge will tell you you can consider that. You consider that when you weigh those aggravating circumstances. They were real people with real dreams—

MR. ENGLE: Your Honor, I'm sorry, but, again, this is a misstatement of the law.

GENERAL THURMAN: It is not a misstatement of the law. They can consider that, Your Honor.

THE COURT: Consider it—I will instruct the jury in terms of how they should consider this.

GENERAL THURMAN: But don't forget all the lives, not only theirs, that were destroyed by Paul Reid, and it's time for him to face the responsibility for that. It's time for him to have the ultimate punishment. Each of you know what that is. It's time for justice. Thank you.

■ In evaluating the prejudicial effect of any improper prosecutorial argument, this Court must consider:

1. The conduct complained of viewed in light of the facts and circumstances of the case;

2. The curative measures undertaken by the court and the prosecution;

3. The intent of the prosecutor in making the improper arguments;

4. The cumulative effect of the improper conduct and any other errors in the record; and

5. The relative strength and weakness of the case.

*Nesbit,* 978 S.W.2d at 894. Applying these factors, we are of the opinion that any error was harmless. Any impropriety in the prosecutor's closing argument is slight. While the prosecutor should have used the word "consider" rather than "weigh," there is no evidence that the prosecutor acted in bad faith, and in fact, his responses to defense objections indicated that he was attempting to comply precisely with the dictates of *Nesbit.* Moreover, the trial court sustained defense objections, properly instructed jurors as to the nature and function of victim impact evidence, emphasized that jurors should apply the law as provided by the court, and reminded jurors that argument of counsel is not evidence. This was a well-tried case from beginning to end, and the cumulative effect factor simply does not apply because this trial was nearly error-free. Finally, the State's case at sentencing was very strong, with clear proof of the three aggravating circumstances and substantial proof rebutting the mitigating evidence. Accordingly, under these circumstances, we have no hesitation in finding any improper argument during the prosecutor's closing harmless. *Nesbit,* 978 S.W.2d at 893–94.

### VI. *Proportionality Review*

Finally, this court is statutorily required to determine whether: (1) the sentences of

death were imposed in any arbitrary fashion; (2) the evidence supports the jury's finding of statutory aggravating circumstances; (3) the evidence supports the jury's finding that the aggravating circumstances outweigh any mitigating circumstances; and (4) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant. Tenn.Code Ann. § 39–13–206(c)(1) (1997). A thorough review of the record reveals that the evidence is sufficient to support the jury's finding of the three aggravating circumstances and the jury's finding that the aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt. Additionally, there is no indication that the sentences of death were imposed in an arbitrary fashion.[9]

Finally, the sentences of death in this case are not disproportionate to the penalty imposed in similar cases, considering the nature of the crime and the defendant. Tenn.Code Ann. § 39–13–206(c)(1)(D). A death sentence is disproportionate only if it is "plainly lacking in circumstances consistent with those in similar cases in which the death penalty has previously been imposed." *Bland,* 958 S.W.2d at 665. A death sentence is not disproportionate merely because the circumstances of the offense are similar to those of another offense for which the defendant has received a life sentence. *Id.* at 665. Thus, the duty of an appellate court is not to "assure that a sentence less than death was never imposed in a case with similar characteristics," but instead to "assure that no aberrant death sentence is affirmed." *Id.*

While there is no mathematical or scientific formula involved in comparing similar cases, this Court generally considers: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victim's circumstances, including age, physical and mental conditions, and the victim's treatment during the killing; (6) the absence or presence of provocation; (7) the absence or presence of justification; and (8) the injury to and effects on non-decedent victims. *See Vann,* 976 S.W.2d at 107 (citing *Bland,* 958 S.W.2d at 667). When reviewing the characteristics of the defendant, we consider (1) the defendant's prior record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of the helplessness of the victim; and (8) the defendant's capacity for rehabilitation. *Id.* Moreover in conducting this review, "we select from the pool of cases in which a capital sentencing hearing was actually conducted to determine whether the sentence should be life imprisonment, life imprisonment without the possibility of pa-

---

9. The dissent asserts that the majority has made "no meaningful effort to address and rectify" the concerns expressed in his dissenting opinion and in dissenting opinions filed in previous cases. To the contrary, a majority of this Court has thoroughly considered and repeatedly rejected the dissent's challenges to the proportionality review process, choosing instead to adhere to the framework carefully explained in *State v. Bland,* 958 S.W.2d 651

(Tenn.1997). *See, e.g., State v. Godsey,* 60 S.W.3d 759, 781–86 (Tenn.2001); *State v. Bane,* 57 S.W.3d 411, 430 (Tenn.2001); *State v. Stout,* 46 S.W.3d 689, 708 (Tenn.2001); *State v. Keen,* 31 S.W.3d 196, 223–24 (Tenn. 2000); *Bland,* 958 S.W.2d at 666–670. A majority of this Court remains convinced that the proportionality analysis outlined in *Bland* is more than sufficient to ensure that no aberrant death sentence is imposed.

role, or death." *Carruthers,* 35 S.W.3d at 570 (citing *Bland,* 958 S.W.2d at 666).

Considering the record in this case in light of these factors, the proof shows that, while robbing a Captain D's, the defendant repeatedly shot two unresisting employees as they were lying face down on the floor. Sarah Jackson had been shot at close range four times in the back of the head and once in the back. Steve Hampton had been shot at close range twice in the back of the head and once in the back. The number of wounds suggested that the defendant manually reloaded his .32 caliber revolver during the assault. Both the robbery and the murders appear to be premeditated, intentional, and well-planned, lacking any indicia of impulsiveness. The apparent motivations for the robbery and murders are greed and a desire to avoid prosecution.

The defendant was thirty-nine-years-old at the time these crimes were committed and had been convicted in Texas in 1984 of aggravated robbery. In 1978, the defendant had two felony indictments in Texas dismissed based upon a finding of permanent incompetence, and he was judicially committed to a psychiatric hospital but was later found to be malingering. As a juvenile, the defendant received probation for a theft and assault charge. As to mitigation, the defendant introduced proof showing that he had an unstable childhood, that he had exhibited mental and behavioral problems from a very early age, and that he had brain damage that was caused by either a congenital defect or trauma. However, the proof established no causal connection between this brain damage and the crimes committed by the defendant. Although mental health professionals testified that the defendant was schizophrenic and delusional, there was substantial evidence regarding the defendant's history of malingering and testimony that any psy-chological disorder he suffered was in remission at the time he committed these offenses. Finally, no evidence was presented to show that the defendant cooperated with the authorities or exhibited remorse for the killings, and there is nothing in the record to indicate the defendant is amenable to rehabilitation.

While no two capital cases and no two defendants are alike, we have compared the circumstances of the present case with the circumstances of similar first degree murder cases and conclude that the penalty imposed in the present case is not disproportionate to the penalty imposed in similar cases. *See, e.g., State v. Chalmers,* 28 S.W.3d 913 (Tenn.2000) (imposing the death penalty upon finding aggravating circumstance (i)(2) where the defendant shot and robbed a twenty-eight-year-old victim); *State v. Cribbs,* 967 S.W.2d 773 (Tenn.1998) (imposing the death penalty upon finding the (i)(2) and (i)(7) aggravating circumstances where the twenty-three-year-old defendant murdered a woman after burglarizing her home); *State v. Bush,* 942 S.W.2d 489 (Tenn.1997) (imposing the death penalty upon finding the (i)(5) and (i)(6) aggravating circumstances, despite substantial evidence of the defendant's troubled childhood, mental problems, and his initial incompetence to stand trial); *Hines,* 919 S.W.2d at 573 (imposing the death penalty upon finding the (i)(2), (i)(5), and (i)(7) aggravating circumstances despite evidence that the defendant had a troubled childhood, was abandoned by his parents, had abused drugs and alcohol as a teenager, and suffered from self-destructive behavior, paranoid personality disorder, dysthymia, and chronic depression); *State v. Cazes,* 875 S.W.2d 253 (Tenn.1994) (imposing the death penalty upon finding the (i)(2), (i)(5) and (i)(7) aggravating circumstances despite mitigation proof regarding the defendant's troubled childhood and his possible

neurological damage); *Smith,* 868 S.W.2d at 561 (imposing the death penalty upon finding the (i)(5), (i)(6), (i)(7), & (i)(12) aggravating circumstances despite mitigation evidence that the defendant had been hospitalized for depression, paranoid personality disorder, chronic depressive neurosis, and paranoid delusional disorder); *State v. Howell,* 868 S.W.2d 238 (Tenn.1993) (imposing the death penalty upon finding the (i)(2) and (i)(7) aggravating circumstances, despite substantial proof that the defendant had traumatic brain damage, where the twenty-seven-year-old defendant shot and killed a convenience store clerk during a robbery); *State v. Harris,* 839 S.W.2d 54 (Tenn.1992) (imposing the death penalty upon finding the (i)(2), (i)(5), and (i)(7) aggravating circumstances, despite evidence of the defendant's lack of education and troubled childhood, where the thirty-two-year-old defendant murdered two employees during the robbery of a hotel).

After reviewing the cases set out above and others not herein detailed, we are of the opinion that the penalties imposed by the jury in this case are not disproportionate to the penalties imposed for similar crimes.

### VII. Conclusion

We have considered the entire record in this case and find that the sentences of death were not imposed in any arbitrary fashion, that the sentences of death are not excessive or disproportionate, and that the evidence supports the jury's finding of the statutory aggravating factors and the jury's finding that these aggravating factors outweighed mitigating factors beyond a reasonable doubt. We have also considered all the defendant's assignments of error and conclude that none require reversal. With respect to issues not specifically addressed herein, we affirm the decision of the Court of Criminal Appeals,

authored by Judge David G. Hayes, and joined in by Judge John Everett Williams and Judge James Curwood Witt, Jr. Relevant portions of that opinion are published hereafter as an appendix. The defendant's convictions and sentences are affirmed. The sentences of death shall be carried out as provided by law on ,the 29th day of April, 2003, unless otherwise ordered by this Court or other proper authority. It appearing that the defendant is indigent, costs of this appeal are taxed to the State of Tennessee.

ADOLPHO A. BIRCH, JR., filed a concurring & dissenting opinion.

ADOLPHO A. BIRCH, JR., J., concurring and dissenting.

I concur with the majority's opinion affirming the conviction of the defendant. With regard to the imposition of the death sentences in this case, however, I cannot agree. My concerns, as expressed below, pertain to my continued dismay with the comparative proportionality review protocol imposed by the majority.

In accordance with my previous dissents, I maintain that the comparative proportionality review process applied by this Court fails because it does not protect defendants from the arbitrary and disproportionate imposition of the death penalty. *See, e.g., State v. Austin,* 87 S.W.3d 447, 467 (Tenn.2002) (Birch, J., concurring and dissenting); *State v. Godsey,* 60 S.W.3d 759, 793 (Tenn.2001) (Birch, J., concurring and dissenting); *State v. Bane,* 57 S.W.3d 411, 431 (Tenn.2001) (Birch, J., concurring and dissenting); *State v. Chalmers,* 28 S.W.3d 913, 923 (Tenn.2000) (Birch, J., concurring and dissenting); *State v. Keen,* 31 S.W.3d 196, 234 (Tenn.2000) (Birch, J., dissenting). In this context, this case is not distinguishable from those listed.

I have grave concerns, as expressed in the aforementioned dissents, about the

comparative proportionality review protocol employed by the majority in capital cases. There has, in my opinion, been no meaningful effort to address and rectify these concerns. This lack of effort, in combination with my strongly held conviction that the Court is not properly fulfilling its statutory obligation to determine whether "the sentence of death is excessive or disproportionate to the penalty imposed in similar cases,"[1] causes me to respectfully disagree with the decision to affirm the death penalty imposed in this case. Accordingly, I would reverse the sentences of death and remand the case for re-sentencing.

## APPENDIX

(Excerpts from the Court of Criminal Appeals' Decision)

IN THE COURT OF CRIMINAL
APPEALS OF TENNESSEE
AT NASHVILLE

March 13, 2001 Session

STATE OF TENNESSEE v. PAUL
DENNIS REID, JR.

Direct Appeal from the Criminal Court for Davidson County, No. 97–C–1834, Cheryl Blackburn, Judge

No. M1999–00803–CCA–R3–DD—
Filed May 31, 2001

### OPINION

[Deleted: Summary of Facts]

[Deleted: I. Motion to Suppress]

### II. Voir Dire of the Venire

#### A. Use of Religious Tests

Prior to trial, the Appellant filed a motion requesting that the court prohibit the use of "religious tests" during jury

selection. He argued that the removal for cause of prospective jurors who oppose the imposition of the death penalty because of "sincerely held" religious, moral or philosophical beliefs violates Article I, section 6 of the Tennessee Constitution. He further asserted that the question, "whether the juror's 'sincerely held' religious, moral, or philosophical beliefs would preclude them from following their oath as jurors," violates Article I, sections 3, 4, 6, 8, and 17 and Article XI, section 8 of the Tennessee Constitution. Indeed, the Appellant argued that the only inquiry which is constitutionally permissible when a prospective juror expresses an opposition to the death penalty upon religious, moral or philosophical grounds is that of determining whether the belief is sincerely held. The trial court denied the Appellant's motion. The Appellant now contends that this denial was error.

A person otherwise competent may not be disqualified as a juror because of his or her religious beliefs. In other words, no religious test shall be put forth to the person. Religious tests probe religious beliefs. *See Wolf v. Sundquist*, 955 S.W.2d 626, 631 (Tenn.App.), *perm. to appeal denied*, (Tenn.1997) (citing *Torcaso v. Watkins*, 367 U.S. 488, 494, 81 S.Ct. 1680, 1683, 6 L.Ed.2d 982 (1961); *Paty v. McDaniel*, 547 S.W.2d 897, 908 (Tenn. 1977), *rev'd on other grounds*, 435 U.S. 618, 98 S.Ct. 1322, 55 L.Ed.2d 593 (1978)). For example, a person may not be excluded from jury service because of their lack of belief in a Supreme Being nor may a judge coerce a prospective juror to take an oath which includes a reference to God where the prospective juror is an atheist. *See generally* 47 AM.JUR. 2d, *Jury* § 177 (1995). However, the exclusion by a trial court of prospective jurors because of their

1. Tenn.Code Ann. § 39–13–206(c)(1)(D) (2001).

moral or religious-based reluctance to impose the death penalty is not error. In this regard, potential jurors are removed for cause not because of their religious opinion or affiliation but because the jurors are unable to view the proceedings impartially and perform their duties in accordance with the juror's oath. *See generally State v. Jones*, 789 S.W.2d 545, 547 (Tenn.), *cert. denied*, 498 U.S. 908, 111 S.Ct. 280, 112 L.Ed.2d 234 (1990); *State v. Bobo*, 727 S.W.2d 945, 949 (Tenn.), *cert. denied*, 484 U.S. 872, 108 S.Ct. 204, 98 L.Ed.2d 155 (1987). The Court of Appeals, in *Wolf v. Sundquist*, reaffirmed this principle, stating:

> It is now settled that a criminal defendant's constitutional rights are not violated by excusing prospective jurors for cause when their personal beliefs concerning the death penalty would prevent or substantially impair their performance as a juror in accordance with their instructions and their oath.

*Wolf v. Sundquist*, 955 S.W.2d at 629 (citing *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980); *State v. Hutchison*, 898 S.W.2d 161, 167 (Tenn. 1994), *cert. denied*, 516 U.S. 846, 116 S.Ct. 137, 133 L.Ed.2d 84 (1995); *State v. Alley*,

776 S.W.2d 506, 518 (Tenn.1989), *cert. denied*, 493 U.S. 1036, 110 S.Ct. 758, 107 L.Ed.2d 775 (1990)). The court further held that questioning jurors concerning their religious beliefs with regard to the death penalty does not amount to a religious test.[1] *Wolf v. Sundquist*, 955 S.W.2d at 631. In sum, the court held that the exclusion of jurors who because of their religious beliefs cannot apply the law to the facts of a particular case is not error.[2] *Wolf v. Sundquist*, 955 S.W.2d at 633. This issue is without merit.

### B. Other Issues Concerning Voir Dire

The Appellant raises additional issues regarding the trial court's direction of voir dire within the jury selection process in his case. Specifically, the Appellant contends that the court improperly limited the Appellant's ability to learn about potential jurors' attitudes toward mental health evidence, improperly questioned jurors concerning opinions about the death penalty, and improperly commented that the court expected the Appellant to be found guilty. The State asserts that the Appellant has waived any challenge related to jury composition based upon his failure to exhaust all peremptory challenges. With regard to challenges to specific jurors,[3] we agree that the Appellant has waived any challenge on appeal. *See generally State v. Howell*, 868 S.W.2d

---

1. Like the State, we are strained to find logic behind the Appellant's assertion that the only appropriate inquiry is whether a religious belief is "sincerely held." Accordingly, we find it unnecessary to address this complaint.

2. The Appellant recognizes the Court of Appeals' decision in *Wolf v. Sundquist* as dispositive of this issue. Notwithstanding, he asserts that *"Wolf* is incorrectly decided." As the State acknowledges, the Appellant fails to offer any argument for his position. We agree with the Court of Appeals' rationale in *Wolf*. Accordingly, we reject the Appellant's contention that the court's decision is flawed.

3. The Appellant's brief makes reference to Prospective Juror Gerald Hodges in his challenge to the limitation of questioning into mental health issues. Additionally, within his challenge to the trial court's questioning the jurors regarding their opinion of the death penalty, the Appellant makes specific reference to prospective jurors William Nelson, Gerald Hodges, Gary Hixson, Terry McNabb, Troy Calloway, Willie King, Patricia Anderson, Justin Law and Robert Brown. These challenges are waived for failure to exhaust all peremptory challenges.

238, 248 (Tenn.1993), *cert. denied,* 510 U.S. 1215, 114 S.Ct. 1339, 127 L.Ed.2d 687 (1994); *State v. Middlebrooks,* 840 S.W.2d 317, 329 (Tenn.1992); *State v. Teel,* 793 S.W.2d 236, 247 (Tenn.), *cert. denied,* 498 U.S. 1007, 111 S.Ct. 571, 112 L.Ed.2d 577 (1990). It is only where a defendant exhausts all of his peremptory challenges and is thereafter forced to accept an incompetent juror can a complaint about the jury selection process have merit. *State v. Coury,* 697 S.W.2d 373, 379 (Tenn.Crim. App.1985) (citing *Hale v. State,* 198 Tenn. 461, 281 S.W.2d 51 (1955); *McCook v. State,* 555 S.W.2d 411, 413 (Tenn.Crim. App.1977)). Further, the record shows that the jury that heard the case was fair and impartial. There is nothing in the record to show that any prejudice resulted to the Appellant by the manner of the selection process utilized. Accordingly, we find no error. However, because of the manner in which the remaining challenges are phrased, we choose to address the challenges on their merits.

### 1. Limitation of Inquiry into Mental Health Evidence as Mitigating Circumstance

■ Tennessee Rule of Criminal Procedure 24(a), in pertinent part, states that the trial court "shall permit questioning by the parties for the purpose of discovering bases for challenge for cause and enabling an intelligent exercise of peremptory challenges." It further states that "[t]he court ... may direct that any portion of the questioning of a prospective juror be con-ducted out of the presence of the tentatively selected jurors and other prospective jurors." Although the rule provides no test for determining whether the scope of questioning is adequate to fulfill the rule's purpose, Tennessee courts have held that "the scope and extent of voir dire is entrusted to the discretion of the trial judge, and his actions will not be disturbed unless clear abuse of discretion is shown." *State v. Harris,* 839 S.W.2d 54, 65 (Tenn.1992), *cert. denied,* 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993); *see also State v. Smith,* 993 S.W.2d 6, 28 (Tenn.), *cert. denied,* 528 U.S. 1023, 120 S.Ct. 536, 145 L.Ed.2d 415 (1999). Thus, the method of voir dire, *i.e.,* individual or group,[4] the questions that may be asked, and the scope of inquiry are all within the discretion of the trial court.[5]

■ In the present case, the trial court, prior to the commencement of jury selection, instructed counsel that individual voir dire would be limited to issues surrounding pretrial publicity and death qualification, "unless there has been something on that questionnaire that we need to deal with individually." Defense counsel informed the court that, from the questionnaires,

an amazingly large number of jurors recorded for us mental health issues related to themselves or to their family. As this obviously would be a subject of voir dire where they have indicated something which is innately a personal

---

4. *Howell,* 868 S.W.2d at 247; *State v. Van Tran,* 864 S.W.2d 465, 473–474 (Tenn.1993), *cert. denied,* 511 U.S. 1046, 114 S.Ct. 1577, 128 L.Ed.2d 220 (1994).

5. *State v. Smith,* 857 S.W.2d 1, 19–20 (Tenn. 1993), *cert. denied,* 510 U.S. 996, 114 S.Ct. 561, 126 L.Ed.2d 461 (1993); *State v. Irick,* 762 S.W.2d 121, 125 (Tenn.1988), *cert. de-nied,* 489 U.S. 1072, 109 S.Ct. 1357, 103 L.Ed.2d 825 (1989); *State v. Poe,* 755 S.W.2d 41, 45 (Tenn.1988), *cert. denied,* 490 U.S. 1085, 109 S.Ct. 2111, 104 L.Ed.2d 671 (1989); *Kennedy v. State,* 186 Tenn. 310, 319, 210 S.W.2d 132, 136 (1947), *cert. denied,* 333 U.S. 846, 68 S.Ct. 659, 92 L.Ed. 1129 (1948).

topic, I wonder if the Court would like to consider those questions.[6]

The court denied the Appellant's request to question jurors during individual voir dire regarding mental health issues, but stated, "that is something that you can deal [with] within the general voir dire." The trial court additionally informed defense counsel that during the individual voir dire they could ask the general question, "Will you consider all mitigation?" and also permitted the parties to question the potential jurors regarding any matters that the jurors had designated as "private" on their questionnaires. Regarding group voir dire, the trial court limited inquiry into mental health issues, requiring any question to be an attempt to clarify a position stated in the questionnaire or be a general inquiry regarding the juror's ability to consider mental health testimony.[7] The Appellant now contends that the limitations placed on voir dire prevented him from developing possible cause challenges against jurors who had already expressed negative attitudes about mental health evi-

dence,[8] thereby rendering the limitations essentially meaningless.

We cannot conclude that the trial court abused its discretion. Defense counsel had access to the questionnaires of the prospective jurors. The questionnaires combined with the permissible inquiries as to mental health issues during individual and group voir dire provided the Appellant with ample background information from which to exercise peremptory challenges. Accordingly, we find that the limited restrictions placed upon the parties by the trial court were reasonable and were well within the trial court's discretion. This issue is without merit.

### 2. Court Implied to Venire that Appellant was Guilty

The Appellant cites to numerous statements by the trial court which he asserts "implicitly conveyed that the court expected the [Appellant] to be found guilty of first-degree murder, so that a penalty phase would necessarily occur thereafter." The Appellant contends that the inference from the trial court's directions to the venire implied that the court "viewed the

6. The venire completed an extensive questionnaire prior to voir dire. Pursuant to the Appellant's request, the questionnaire included multiple inquiries regarding mental health issues. Of relevance to this issue:

> Question Number 44 Do you believe that diagnosis or treatment provided by a psychiatrist or psychologist or other qualified professional might be helpful?
> Question Number 45 Have you, anyone in your family or close personal friend ever received any type of inpatient or out-patient mental health counseling or treatment?
> Question Number 46 Have you, any member of your family ... or close personal friend ever taken any type of psychotropic drug or other medications for depression, anxiety or any other psychological or psychiatric problem or disorder?
> Question Number 47 Have you ever had an unpleasant experience or confrontation

> with someone who suffered from any type of mental illness or emotional disorder, or someone who has lost control of their behavior?
> Question Number 48 Do you hold an opinion about defendants who use mental health as an excuse for their actions?

7. The court's restrictions during group voir dire arose from the court's concern over the recent case of *State v. Reid*, 981 S.W.2d 166 (Tenn.1998)(notice requirements of intent to use mental health evidence as mitigation and ability to withdraw notice of intent at any time prior to presenting such evidence), and unfair disadvantage to the State.

8. The Appellant specifically refers to prospective jurors Hodges and Fears. Again, based upon his failure to exercise all available peremptory challenges, the Appellant has waived any challenge to individual jurors.

[Appellant's] convictions as a foregone conclusion." Accordingly, he avers that the court's comments resulted in prejudice to the judicial process requiring reversal. *See* Tenn. R.App. P. 36(b).

Without reiterating verbatim the challenged language of the trial court to the venire, we acknowledge that the court, for example, used the term "**until** he is found guilty beyond a reasonable doubt of murder in the first-degree" rather than the term "**unless** he is found guilty beyond a reasonable doubt of murder in the first-degree." The Appellant argues prejudice without considering the context in which the court's statements were provided. Indeed, one challenged comment of the court, placed in full context of the court's instruction, provided:

> Mr. Reid hasn't been found guilty of anything. That is what the trial is about, so I want to make certain that you understand he is presumed innocent as he sits in front of you, and that presumption stays with him until he is found guilty after you hear the proof in the case, so just because we are asking you questions with regard to the possible punishments in this case, I want to make certain you keep in mind that he has not been found guilty of anything, but the reason we have to ask you these questions is that we must have jurors who can consider all three possible punishments.

We disagree with the Appellant's argument that this instruction compels the finding that the court implied to the jury the Appellant's guilt. Given the entire context of the voir dire, we conclude that no reasonable juror could have believed that the court was instructing him or her to return a guilty verdict. This issue is without merit.

**[Deleted: III. Sufficiency of the Evidence]**

## IV. Evidentiary Issues: Guilt Phase

### A. Admissibility of Testimony of Sergeant Hunter

The Appellant argues that the trial court erred by permitting Sgt. Johnny Hunter to testify as an expert witness in the field of blood spatter analysis. Specifically, the Appellant contends that this testimony violated his constitutional right to a fair trial because the defense was unfairly surprised. We disagree and find no error.

Sgt. Hunter was qualified by the court to testify as an expert on fingerprint analysis and comparison, as well as blood spatter analysis. The Appellant complains that he received no advance notice that the State was intending to introduce expert testimony in the field of blood spatter analysis and that he was denied the opportunity to effectively cross-examine the witness. Sgt. Hunter's report, which was provided to the defense prior to trial, mentioned that no visible blood spatter was found, with the exception of a small amount of blood on the floor around the victims. At trial, Sgt. Hunter testified about blood patterns found on the floor and surrounding area, specifically noting the absence of blood spattering. Sgt. Hunter further testified that the absence of blood spattering indicated that the victims were lying on the ground when they were shot. He further stated that the blood pattern on a shelf to the right of one of the victims, Sarah Jackson, indicated that she had attempted to lift herself up after being shot.

The Appellant is not contesting Sgt. Hunter's qualifications, but rather insists that he was surprised by his testimony in this respect. Although the Appellant argues that he had no notice that Sgt. Hunter would testify about blood spattering at trial, the Appellant fails to explain how he

was prejudiced by this testimony. Over a year before trial, the Appellant was provided with a copy of Sgt. Hunter's report, which stated that a small amount of blood was found on the floor near the victims. The Appellant cannot complain about Sgt. Hunter's testimony simply because he failed to find any significance in the report which was properly and timely provided to him by the State. This issue is without merit.

### B. Testimony of TBI Agent Linda Littlejohn Regarding Length of Shoes Seized

The Appellant argues that the trial court erred by allowing Tennessee Bureau of Investigation Agent, Linda Littlejohn, to testify that the length of the shoes seized from the Appellant's apartment were within the range of the unidentified shoe print left at the scene of the crime. Specifically, he contends that the technique used in "measuring" the enlarged photographic negative was not shown to meet the standards of admissibility for expert testimony set forth in *McDaniel v. CSX Transp.*, 955 S.W.2d 257 (Tenn.1997). Additionally, the Appellant asserts that the admission of Agent Littlejohn's testimony violated Tenn. R. Evid. 702 and 401.

Determinations of the admissibility of expert testimony are made within the sound discretion of the trial court. *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn.1993). The standard of review on appeal is whether the trial court abused its discretion in excluding the expert testimony. The abuse of discretion standard contemplates that, before reversal, the record must show that a judge "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Shirley*, 6 S.W.3d 243, 247

(Tenn.1999); *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn.1997).

In the present case, Agent Littlejohn testified that a ruler was placed near the shoe print found at the crime scene before the photograph was taken. The negatives were later developed and "one to one photographs were made, and that would be where the negative is enlarged to where the ruler in the photograph is actually the same size of the ruler next to the print at the scene, so the photographs ... would be exactly the same size as the print at the crime scene." Both tread and length were determined using this same technique. After comparing the photograph and the shoes, Agent Littlejohn testified that none of the treads on the shoes recovered from the Appellant's apartment matched the print left at the crime scene. Although Agent Littlejohn testified that she could not speculate as to the actual size of the shoe worn by the perpetrator because different styles and brands would vary slightly in length, she did testify, however, that the length of the shoe print found at the scene fell within the range of lengths of the nine pairs of shoes seized from the Appellant's apartment. Specifically, she testified that the shoe print found at the scene measured 12 and 3/8 inches in length. The shoes taken from the Appellant's apartment ranged from 11 13/16 inches to 12½ inches in length.

First, the Appellant contends that the trial court erred in admitting Agent Littlejohn's testimony regarding the length of the shoe print because it did not comport with standards for expert testimony set forth in *McDaniel*, 955 S.W.2d at 257. We note that the Appellant does not contest this measurement technique with respect to the tread identification testimony, which was favorable to him. Rather, he only attacks this technique with respect to the length of the shoe print. The Appellant

further argues that the trial court erred by violating Tenn. R. Evid. 702, which reads, "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise."

In *McDaniel,* the Tennessee Supreme Court held that a trial court may consider the following factors when determining the reliability of scientific evidence: (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether, as formerly required by *Frye,* the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation. *McDaniel,* 955 S.W.2d at 265. In this instance, the following dialogue took place during a jury-out hearing:

THE COURT: Well, let me ask Ms. Littlejohn a couple of questions. Ms. Littlejohn, the training that you had in terms of the conclusions that you drew, were these standard procedures used in that field?

LITTLEJOHN: Yes, I mean—

THE COURT: Okay, and it is the blowing up, the one-on-one comparison—

LITTLEJOHN: Uh-huh.

THE COURT: —and is that what your training indicates?

LITTLEJOHN: . . . yes, ma'am.

THE COURT: And is that the standard used in your field?

LITTLEJOHN: Yes, it is.

THE COURT: All right, and is there scientific literature with regard to this, I mean—

LITTLEJOHN: Yes, there is.

THE COURT: —and is this subject to being able to be proven or disproved?

LITTLEJOHN: Yes.

THE COURT: Okay, so there are scientific principles behind this?

LITTLEJOHN: Yes.

THE COURT: So you blow it up one-on-one, which is the exact size of the print, and then you just make a comparison of both in tread and otherwise, and apparently you did that in this case that [defense counsel] does not object to?

LITTLEJOHN: Yes, your honor.

DEFENSE: Correct.

THE COURT: Okay, so you used that same methodology to compare the prints, the tread, and that, that you used to make the size comparison?

LITTLEJOHN: Basically. . . .

We conclude that the above text, along with other testimony presented at the jury-out hearing, more than satisfies the factors set forth in *McDaniel.* The evidence presented at both the jury-out hearing and trial indicated that the technique used by Agent Littlejohn was standard procedure and widely accepted in the field of shoe and footprint comparison. Agent Littlejohn properly qualifies as an expert in shoe and footprint comparison and her testimony would have substantially assisted the trier of fact due to her education, experience, and training. *See* Tenn. R. Evid. 702. Moreover, the Appellant was able to solicit testimony during cross-examination that the length of the print found would be fairly common among the general population. This issue is without merit.

The Appellant also argues that Agent Littlejohn's testimony concerning range of length was irrelevant. *See* Tenn. R. Evid. 401 and 402. Tennessee Rules of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Clearly, testimony concerning the shoe prints found at the crime scene as compared to the shoes seized from the Appellant's apartment is relevant evidence that was properly admitted. This issue is without merit.

### C. Admissibility of Cash Register Receipts Seized from Appellant's Residence

The Appellant argues that the trial court erred in admitting into evidence cash register receipts seized from the Appellant's residence that were not properly authenticated pursuant to Tenn. R. Evid. 901. Specifically, he contests the authentication of the receipts because the prosecution failed to call as witnesses representatives of the respective businesses to testify as to the legitimacy and accuracy of the receipts. The prosecution, through the testimony of Detective Postiglione, introduced three cash register receipts seized from the Appellant's residence: (1) a Wal-Mart receipt in the amount of $78.34, dated February 17, 1997; (2) a Wal-Mart receipt dated the same day in the amount of $69.29; and (3) a receipt from Jumbo Sports dated February 18, 1997, for $97.41. The purpose for the introduction of these receipts was to show that the Appellant had spent a large amount of money in a short period of time after the murders despite the fact that he was in dire financial trouble at the time. At trial, defense counsel objected to the introduction of the receipts, arguing that the re-

ceipts had not been properly authenticated. The trial court overruled the objection and found the cash register receipts admissible. Upon reviewing this issue, we agree that the receipts were admissible.

Rule 901(a) of the Tennessee Rules of Evidence provides that "[t]he requirement of authentication ... is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Notwithstanding, Rule 902(7) states that extrinsic evidence of authenticity is not required as a condition precedent to admissibility when the item or items sought to be admitted are "[i]nscriptions, signs, tags, or labels purporting to have been affixed in the course of business and indicating ownership, control or origin." In the present case, two of the receipts were from Wal-Mart and one receipt was from Jumbo Sports. All three receipts were in printed form, bearing the retailer's name, address, and other relevant information. This printed material constitutes an "inscription" for purposes of satisfying Rule 902(7). *See, e.g., United States v. Hing Shair Chan,* 680 F.Supp. 521, 526 (E.D.N.Y.1988) (a hotel record on hotel stationary was held to be self-authenticating); *State v. DeLeon,* No. CA 17574, 2000 WL 646502 (Ohio App.2d May 19, 2000) (bill of sale for automobile bearing dealer's name and address held to be self-authenticating); Neil P. Cohen, et. al., *Tennessee Law of Evidence* §§ 9.02[9] (4th ed. 2000). Thus, the cash register receipts were self-authenticating and properly admitted at trial. This issue is without merit.

## V. Closing Argument at Guilt Phase

### A. Prosecutorial Comment on Appellant's Failure to Testify

The Appellant argues that the trial court erred by denying defense coun-

sel's motion for a mistrial when, during closing arguments of the guilt/innocence phase, the prosecution commented on the Appellant's failure to testify. A prosecutor is strictly prohibited from commenting on the defendant's decision not to testify. *Coker v. State,* 911 S.W.2d 357, 368 (Tenn. Crim.App.1995). However, a prosecutor's statement that proof is unrefuted or uncontradicted is not an improper comment upon a defendant's failure to testify. *State v. Thomas,* 818 S.W.2d 350, 364 (Tenn. Crim.App.1991); *Coury,* 697 S.W.2d at 378.

In the present case, the Appellant did not testify at trial. However, a videotaped statement to the detectives following the Appellant's arrest was played before the jury. In this tape, the Appellant stated that he did not know how his fingerprint got on Hampton's Movie Gallery card. Nonetheless, he also told detectives "I'm not surprised that it is on there." During closing arguments of the guilt/innocence phase, defense counsel made the following statements:

> I believe the evidence showed that card was found the next day, over 24 hours after the robbery happened. You heard that it was found on Ellington Parkway, about a mile from [the Appellant's] house. You heard that [the Appellant] had a car that broke down all the time. If a person was near something and your car breaks down and you walk by something, you might pick that up and throw it back down. Four months after the fact, you may not even remember that.

Additionally, defense counsel questioned the prosecution's reasoning for playing the videotaped statement during trial. In its closing arguments, the prosecution responded to defense counsel's comments as follows:

> [Defense counsel] talked about why did the State put in the statement. Because he gave it, and you, as jurors, have a right to hear it. You did hear it, and we put in on for one reason; because he was given chance after chance to explain how his fingerprint could have gotten on that card. He said I'm not surprised it is on there. *Would he ever have an explanation?* [Defense counsel] grabbed one out of the air, and there is no basis in fact or evidence for anything else, and said, well maybe his car broke down.

(Emphasis added). The Appellant maintains that the prosecution's statement of "When would he ever have an explanation?" clearly commented upon the fact that the Appellant failed to explain during his statement to police the presence of his fingerprint on property that had been in the possession of one of the victims. Additionally, he contends that the prosecutor wrongfully commented on the Appellant's failure to take the witness stand and offer an explanation at trial. We disagree. This was clearly rebuttal argument directed toward defense counsel's earlier argument that the Appellant could have picked up the movie card while walking after his car broke down. We do not find that the statement can be fairly characterized as a comment on the Appellant's failure to testify. At most, the comment was mere argument by the prosecution that its proof was unrefuted or uncontradicted. *See Coury,* 697 S.W.2d at 378. This issue is without merit.

### B. Prosecutorial Comment During Closing Arguments

The Appellant argues that the trial court erred by overruling defense counsel's objection to the prosecution's statement during closing argument that the Appellant's foot was the "same size" as shoe prints left at the scene. Specifically, the Appellant

contends that the comment was prejudicial "because the prosecutor's comments constituted a misstatement of the evidence on a crucial matter."

Closing arguments are an important tool for the parties during the trial process. Consequently, the attorneys are usually given wide latitude in the scope of their arguments, *see State v. Bigbee*, 885 S.W.2d 797, 809 (Tenn.1994), and trial judges, in turn, are accorded wide discretion in their control of those arguments, *see State v. Zirkle*, 910 S.W.2d 874, 888 (Tenn.Crim.App.1995). Notwithstanding such, arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law. *Coker v. State*, 911 S.W.2d 357, 368 (Tenn. Crim.App.1995). To justify a reversal on the ground of improper argument of counsel, it must affirmatively appear that the improper conduct affected the verdict to the prejudice of the defendant. *Harrington v. State*, 215 Tenn. 338, 385 S.W.2d 758, 759 (1965); *State v. McBee*, 644 S.W.2d 425, 428 (Tenn.Crim.App.1982). Furthermore, the following factors must be considered by this court in making such a determination: 1) the conduct complained of, viewed in light of the facts and circumstances of the case; 2) the curative measures undertaken by the court and the prosecutor; 3) the intent of the prosecutor in making the improper statement; 4) the cumulative effect of the improper conduct and any other errors in the record; and 5) the relative strength or weakness of the case. *Bigbee*, 885 S.W.2d at 809; *State v. Buck*, 670 S.W.2d 600, 609 (Tenn.1984).

In the present case, Agent Littlejohn testified that the unidentified shoe print found at the crime scene was within the range of the length of shoes seized from the Appellant's residence. She also testified that it is common for the same "shoe sizes" to vary in length based upon the brand name and manufacturer of the shoe. Accordingly, Agent Littlejohn declined to specifically identify the shoe print as being a particular size. Because the shoes taken from the Appellant's apartment ranged in length from 11 and 13/16 inches to 12 and ½ inches, Agent Littlejohn testified that she had no doubt that the shoe print found at the scene, which measured 12 and 3/8 inches in length, fell within the range of length of shoes taken from the Appellant's apartment. Thus, the Appellant could not be excluded from having left the print.

During closing arguments of the guilt/innocence phase, the prosecution made the following three comments with respect to the Appellant's "shoe size":

> More than likely, it was the killer, and could that print have excluded [the Appellant] if it [sic] was the killer? Of course, if it was a size 7 or a size 8 or a size 9, but it fit in the *size of the shoe* [the Appellant] wears.
>
> * * *
>
> The footprint could have excluded him. The *same size* of [the Appellant].
>
> * * *
>
> Who has a footprint the *same size* as the one left at the crime scene? [The Appellant].

(Emphasis added). The Appellant argues the above comments made by the prosecution were prejudicial and misrepresented the proof. We disagree. The prosecutor never referred to the unidentified shoe print as being a particular size. While it might have been more preferable for the prosecution to use the terminology "within range of length of [the Appellant's] shoes" instead of "same size," it is clear from the record before us that the prosecution was simply referring to Agent Littlejohn's testimony where she explained that the crime

scene shoe print fell within the range of shoes seized from the Appellant. As the trial court correctly noted, "the State did nothing more than argue its position that, because the length of the unknown print was not inconsistent with the length of the [Appellant's] shoes, the [Appellant] could not be excluded as the perpetrator." Moreover, we note that the trial court also cautioned the jury that "Statements, arguments, and remarks of counsel are intended to help you in understanding the evidence and applying the law, but they are not evidence. If any statements were made that you believe are not supported by the evidence, you should disregard them." As such, we find no evidence of prosecutorial misconduct, nor do we find error which prejudiced the Appellant. Thus, this issue is without merit.

## VI. Instructions on Lesser–Included Offenses

The Appellant argues that it was error for the trial court to deny his request for jury instructions as to the lesser-included offenses of facilitation of first-degree murder and facilitation of especially aggravated robbery. With respect to the premeditated first-degree murder charges, the court instructed the jury on the lesser-included offense of second-degree murder. With respect to the especially aggravated robbery charges, the court instructed the jury on the lesser-included offense of aggravated robbery. The trial court, however, declined to instruct the jury on the lesser-included offense of facilitation.

Initially, we note that, in Tennessee, irrespective of a party's request for a lesser-included jury instruction, "[I]t is the duty of all judges charging juries in cases of criminal prosecutions for any felony … to charge the jury as to all of the law of each offense included in the indictment." Tenn.Code Ann. § 40–18–110(a) (1997).

Moreover, as the State concedes, facilitation is a lesser-included offense of both first-degree murder and especially aggravated robbery. *See generally State v. Burns,* 6 S.W.3d 453 (Tenn.1999). This fact alone, however, is not dispositive of whether error occurred. *See generally Burns,* 6 S.W.3d at 463.

Determining whether a lesser-included offense must be charged in the jury instructions is a two-part inquiry. *Burns,* 6 S.W.3d at 469. First, the court must determine whether any evidence exists that reasonable minds could accept as to the application of a lesser-included offense. *Id.* In making this determination, the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence. *Id.* Second, the trial court must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser-included offense. *Id.* at 467–469.

Criminal responsibility for facilitation of a felony is defined in Tenn.Code Ann. § 39–11–403 (1997) and reads as follows:

(a) A person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39–11–402(2), the person knowingly furnishes substantial assistance in the commission of the felony.

We are unable to conclude under the test announced in *Burns* that reasonable minds could find that anyone other than the Appellant was involved in this crime. Neither the prosecution nor the defense advanced the theory that the Appellant was criminally responsible for facilitating the acts of another at trial. To the contrary, it was the prosecution's theory that the Appellant was solely responsible

for both the murders and the robbery. At trial, the Appellant, in his defense, asserted the position that the prosecution failed to establish his identity as the perpetrator.

On appeal, the Appellant gives several reasons why he was entitled to the lesser-included instructions. First, the Appellant points to his statement to police where he says, "I am not the triggerman." This statement, however, in no way indicates the participation of another person. Second, the Appellant points to his statement where he says he did not know the victims but was "not surprised" his fingerprint was on the victim's Movie Gallery card. He also insists the bloodhounds' tracking of a scent from the location of the card to a nearby residence implicates the involvement of another person. Once again, we do not interpret this to mean another person was involved. Moreover, no evidence was presented at trial to support this contention. Third, the Appellant argues that another person could have been involved because there were many unidentified fingerprints left at the crime scene. The crime scene was a public restaurant and it is expected that many unidentifiable fingerprints would be found at such a location. Fourth, the Appellant points to the fact that one shoe print was never identified. Once again, it is expected in a public restaurant to have many prints, whether fingerprints or shoe prints, that belong to unidentified persons. Fifth, the Appellant maintains that cigarettes were found in an ashtray in the restaurant. The proof at trial, however, indicated that the cigarettes were found at the employees' break station and had not been removed the night before when the employees went home. Sixth, the Appellant argues that his friend, Danny Tackett, testified that he and the Appellant had previously discussed committing robberies against fast food restaurants. Seventh, the Appellant points to the testimony of Mark Farmer, who testified at trial that it was "possible" that someone else could have been in the driver's side of the car. However, he did not testify that there was, or that he thought there was another person in the car. Instead, he only acknowledged that it would have been possible. Finally, the Appellant argues that the composite drawings do not resemble him. The evidence at trial, however, indicates that the drawings were similar and that many features between the composite drawings and the Appellant match.

We find that no reasonable juror could have accepted that the evidence presented in any manner established the commission of the lesser-included offense of facilitation. To the contrary, the entire case is centered around the Appellant as the sole perpetrator and the Appellant's defense of not being involved. Thus, the trial court properly declined to instruct the jury on the lesser-included offenses of facilitation of first-degree murder and facilitation of especially aggravated robbery. This issue is without merit.

## VII. Late Night Court Sessions

■■■ The Appellant argues that the trial court committed reversible error by holding numerous "late night" court sessions. Specifically, the Appellant maintains that the late night sessions caused his attorneys to be tired and less effective than they normally would have been had they been given the opportunity for more rest. In *State v. Parton*, 817 S.W.2d 28, 33 (Tenn.Crim.App.1991), this court addressed the issue of "late night" court sessions as follows:

It is clear in this state that late night court sessions should be scheduled "only when unusual circumstances require it." *McMullin*, 801 S.W.2d at 832. Regard-

less of whether counsel or any juror objects, the late night sessions should be avoided; and they must be justified because of unusual circumstances. If the requisite unusual circumstances do exist and late night sessions are scheduled because of necessity, good practice would be to also let the record affirmatively reflect that all counsel and all jurors expressly agree. But the threshold question which must always be determined by the court is whether the circumstances justify the unusual session.

First, we note that this issue has been waived for failure of defense counsel to object to the late hours at trial and for defense counsel's failure to raise this issue in the motion for new trial. *See* Tenn. R.App. P. 36(a). Notwithstanding the waiver, however, we find that the record does not support the Appellant's argument that the court kept excessively late hours during trial. During the two and one-half weeks of trial, sessions ran "late" on five of the thirteen nights. On the five "late nights," two of which were jury selection, court concluded between 8:30 and 9:25 p.m. We also note that during this period, there were five "off days" where neither counsel nor the litigants had to report to court. Further, this was a sequestered jury from a distant county. The Tennessee Supreme Court has held that a determination of how long into the evening a trial should last is a matter within the discretion of the trial court. *See Poe,* 755 S.W.2d at 47. Although these five days may exceed the "normal eight hour day," we do not find the sessions to be unreasonable in this particular case. This issue is without merit.

## VIII. Evidentiary Issues at Penalty Phase

### A. Dr. Martell as Expert Witness

During the penalty phase of the Appellant's trial, the State called Dr. Daniel Martell as a rebuttal witness and sought to qualify Dr. Martell as an expert in "forensic neuropsychology."[9] During voir dire of Dr. Martell, the State elicited testimony that Dr. Martell obtained both his master's degree and his Ph.D. at the University of Virginia and completed a forensic internship at Bellevue Hospital in New York City. After his internship, he was awarded a postdoctoral fellowship to do advanced study and research in forensic neuropsychology. From this fellowship, Dr. Martell founded the Forensic Neuropsychology Laboratory at Kirby Forensic Hospital in New York City, where he remained as director for the next eight years. Dr. Martell then joined the clinical faculty at the Neuropsychiatric Institute at UCLA and also engaged in private consultation practice. Throughout his career, Dr. Martell has authored numerous papers outlining the relationship between neuropsychology and criminal law and has limited his professional practice to forensic neuropsychology.

Dr. Martell testified that board certification was currently unavailable in the field of "forensic neuropsychology" and there is no professional association for "forensic neuropsychologists." Dr. Martell admitted that, although there is Board Certification and Recognition in the field of neuropsychology, he has never applied for board certification in the field of neuropsychology. On this basis, the Appellant, while conceding Dr. Martell's qualifications as an expert witness in the field of psychology,

---

**9.** Dr. Martell explained that "forensic neuropsychology" is "the study of brain damage, and how it affects violent behavior."

objected to his qualification as an expert in the field of "forensic neuropsychology." The trial court overruled the objection, accepting Dr. Martell's qualifications as an expert in the field of forensic neuropsychology. The Appellant now challenges this ruling, alleging that "an expert is competent to testify 'only as to matters within the limited scope of his or her expertise and licensure.'" Appellant's Brief at 260 (citing *Bolton v. CNA Ins. Co.*, 821 S.W.2d 932, 935 (Tenn.1991)). He contends that the "State never sufficiently established that Dr. Martell was an expert in the field of 'forensic neuropsychology.'" Appellant's Brief at 261.

The determination of the qualifications of an expert witness and the relevancy and competency of expert testimony are matters generally entrusted to the sound discretion of the trial court. *State v. Anderson*, 880 S.W.2d 720, 728 (Tenn. Crim.App.), *perm. to appeal denied,* (Tenn. 1994); *see also* Tenn. R. Evid. 104(a). This court will not overturn the trial court's decision absent a clear abuse of discretion. *Anderson,* 880 S.W.2d at 728 (citing *State v. Williams,* 657 S.W.2d 405, 411 (Tenn.1983), *cert. denied,* 465 U.S. 1073, 104 S.Ct. 1429, 79 L.Ed.2d 753 (1984)).

Rule 702 of the Tennessee Rules of Evidence provides "that in order to testify as an expert and thus be permitted to give conclusions and opinions on a matter involving scientific, technical or other specialized knowledge, a witness must possess sufficient 'knowledge, skill, experience, training, *or* education.'" Neil P. Cohen et al, *Tennessee Law of Evidence* § 7.02[4] at 7–21 (emphasis added). The witness may acquire the necessary expertise through formal education or life experiences. *Id.* However, the witness must have such superior skill, experience, training, education, or knowledge within the particular area that his or her degree of expertise is beyond the scope of common knowledge and experience of the average person. *Id.* (citations omitted).

The record in the present case clearly establishes that forensic neuropsychology is a recognized sub-specialty of psychology regardless of the availability of board certification in this area. It is equally clear that Dr. Martell is more than qualified to testify in this area of practice. Moreover, the issue of whether the courts of this state recognize experts in the area of forensic neuropsychology is not an issue of first impression. The courts of this state have previously permitted experts to testify in this area. *See, e.g., Coe v. State,* 17 S.W.3d 193, 205 (Tenn.), *cert. denied,* 529 U.S. 1034, 120 S.Ct. 1460, 146 L.Ed.2d 344 (2000) (defense presented Dr. Walker as expert witness in field of forensic neuropsychology); *Victor James Cazes v. State,* No. 02C01–9801–CR–00002 (Tenn.Crim. App. at Jackson, Dec. 8, 1999) (Dr. Martell testified as expert in field of forensic neuropsychology). Accordingly, we cannot conclude that the trial court abused its discretion in qualifying Dr. Martell as an expert in forensic neuropsychology.[10]

10. Within his argument, the Appellant additionally alleges that the court's acceptance of Dr. Martell as an expert in the field of forensic neuropsychology undoubtedly resulted in prejudice to his case. Specifically, he asserts that, although he called Dr. Auble, a psychologist with similar training to that of Dr. Martell, he did not seek to qualify her as an expert in forensic neuropsychology. Accordingly, he argues that the jury likely gave Dr. Martell's testimony greater weight than Dr. Auble's testimony. Nothing prevented the Appellant from seeking to qualify Dr. Auble as an expert in forensic neuropsychology. He cannot now complain about an action which he failed to pursue. Tenn. R.App. P. 36(a).

## B. Cross–Examination of Dr. Martell

Prior to Dr. Martell's testimony, the Appellant requested that he be permitted to question Dr. Martell regarding a letter written by Dr. Martell in 1997 to the United States Department of Justice. Relying upon Rule 405 of the Tennessee Rules of Evidence as grounds for the letter's admission, he argues that the letter was relevant to the witness' credibility and bias. The eight-page letter was Dr. Martell's request for a Department of Justice investigation into an incident that had led to rumors of unprofessional and possibly illegal conduct by Dr. Martell in a federal death penalty case.[11] In his letter, Dr. Martell repeatedly asserted his innocence of any wrongdoing and sought an investigation so that he could receive a letter of exoneration from the Department of Justice. Specifically, he emphasized that these allegations had damaged his professional reputation and threatened his "financial status." The allegations concerned an affidavit Dr. Martell had signed in a federal case. This affidavit was discussed by the attorneys and the judge in chambers.[12] Dr. Martell was denied the opportunity to hear the allegations or to defend himself if needed.

In denying admission of Dr. Martell's letter, the trial court found, in relevant part:

> It says I must determine that the questions are proposed in good faith rather than an effort to place before the jury unfairly prejudicial information supported only by unreliable rumors. I'm going to determine that there is no reasonable factual basis for that inquiry.

The Appellant challenges the trial court's ruling, asserting that this information was admissible to show Dr. Martell's credibility and "goes to the prospect of bias." Like other evidentiary rulings, an appellate court reviews a trial court's ruling under Tenn. R. Evid. 608(b) using an abuse of discretion standard. *See Ingram v. Earthman*, 993 S.W.2d 611, 639 (Tenn.App.1998), *cert. denied*, 528 U.S. 986, 120 S.Ct. 445, 145 L.Ed.2d 362 (1999); *State v. Blanton*, 926 S.W.2d 953, 959–60 (Tenn.Crim.App. 1996).

Character evidence may be used in limited circumstances to impeach a witness. *See* Tenn. R. Evid. 404(a)(3) (evidence of character of witness admissible as provided in Rules 607, 608 and 609). However, extrinsic evidence of conduct other than criminal conviction *may not be used* to attack the character of a witness. *See* Tenn. R. Evid. 608(b). Accordingly, Dr. Martell's letter was properly excluded as extrinsic evidence of Dr. Martell's character.

Moreover, certain conditions must be satisfied before allowing inquiry on cross-examination of the witness about specific instances of conduct probative solely of truthfulness or untruthfulness. *See* Tenn. R. Evid. 608(b). First, upon request, the court must hold a hearing outside the jury's presence and must determine that the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry. *See* Tenn. R. Evid. 608(b)(1). If these requirements are met, the court must then determine that the conduct, within limited exceptions, must have occurred no more than ten years before commencement of the action

11. Members of the National Network of Capital Defense Attorneys alleged that, in the case of *United States v. Spivey,* Dr. Martell signed a false affidavit.

12. The Appellant acknowledges that the allegation against Dr. Martell was by defense counsel in that matter and that there is no evidence that the allegation by defense counsel did, in fact, occur.

or prosecution. *See* Tenn. R. Evid. 608(b)(2).

In the present case, the court determined that no "reasonable factual basis" existed for the Appellant's inquiry. We agree. The Appellant offered no evidence of conduct by Dr. Martell evidencing untruthfulness. Rather, the only proof offered was a letter written by Dr. Martell requesting exoneration because of false rumors. The letter itself is not proof of Dr. Martell's untruthfulness. Where there is no factual basis for an inquiry into prior conduct of a witness, the court shall bar any such attempt to interrogate a witness based on mere speculation or rumor. *See State v. Philpott,* 882 S.W.2d 394, 404 (Tenn.Crim.App.1994)( "An attempt to communicate by innuendo through questions which are answered in the negative is impermissible when the questioner has no evidence to support the question."); *see also State v. Bowling,* 649 S.W.2d 281, 283 (Tenn.Crim.App.1983); Neil P. Cohen et al., *Tennessee Law of Evidence* § 6.08[7][d]. Accordingly, we conclude that the trial court did not abuse its discretion in preventing inquiry into Dr. Martell's letter to the Department of Justice. Finally, we fail to see how the letter written by Dr. Martell establishes that Dr. Martell is biased in favor of the State or prejudiced against the Appellant. *See* Tenn. R. Evid. 616. This issue is without merit.

### C. Court's Refusal to Admit Tape-Recording to Rebut Dr. Martell's Testimony

During his testimony, Dr. Martell opined that the Appellant suffered from "delusional disorder, mixed type with persecutory and grandiose themes, in substantial remission." He qualified his diagnosis, however, noting that the Appellant has a lengthy history of malin-gering mental illness and that, in his opinion, the Appellant's delusional disorder was in remission. During cross-examination, defense counsel requested permission to introduce an audiotape of a June 1997 interview by Detective Postiglione of Ms. Dorothy Meadlin, the Appellant's former landlord. Dr. Martell, in forming his opinions of the Appellant, testified that he had reviewed and considered the contents of the audio taped interview. The trial court denied defense counsel's request, finding that the contents of the tape constituted hearsay and were "not appropriate." Specifically, the court stated:

> Mr. Engle, I'm not going to let you do this. It is just flat out not appropriate. I still don't understand why—why you don't call her as a witness? You could have called her as a witness, or you could call Detective Postiglione, if you had reason, in order to put that, in order to authenticate the tape, but to try to get the information of what she has to say in through [Dr. Martell], who is testifying as an expert about Mr. Reid's mental condition, I mean, just exactly what rule of evidence do you think this belongs to?

Defense counsel then sought to introduce a transcript of Ms. Meadlin's testimony provided by the State. The State objected, noting that the State had not provided defense counsel a transcript of the audio taped interview. At this point, defense counsel conceded that the transcript was supplied by the District Attorney's Office in another judicial district. In response to further inquiry by the court, defense counsel stated that he intended to ask Dr. Martell about the tape, whether he considered the tape in making his conclusions, and how he evaluated the tape. Defense counsel further added that he did

not call Ms. Meadlin as a witness because she is sixty-eight years old and infirm. Although defense counsel conceded that he could have sought a deposition from Ms. Meadlin, he stated that he would rather seek admission of the interview through Dr. Martell. The court again refused admission of the tape.

The Appellant challenges the trial court's exclusion of the audiotape during the cross-examination of Dr. Martell. Specifically, the Appellant relies upon the premise that the rules of evidence do not preclude, at a capital sentencing hearing, evidence which establishes or rebuts an aggravating circumstance.

The Appellant is correct in his argument that evidence is not excluded at a capital sentencing hearing merely because the evidence is hearsay. *See* Tenn. Code Ann. § 39–13–204(c). Thus, as long as evidence or testimony is relevant to the circumstances of the murder, the aggravating circumstances of the murder, or the mitigating circumstances and has probative value in the determination of punishment, such evidence is admissible. *See State v. Teague,* 897 S.W.2d 248, 250 (Tenn.1995); *see also State v. Hall,* 8 S.W.3d 593, 602 (Tenn.1999), *cert. denied,* 531 U.S. 837, 121 S.Ct. 98, 148 L.Ed.2d 57 (2000). The admission of evidence, however, is not without constraints. Evidence may properly be excluded if it is so unduly prejudicial that it renders the trial fundamentally unfair. *See State v. Vincent C. Sims,* No. W1998–00634–CCA–R3–DD, 2000 WL 298901 (Tenn.Crim.App. at Jackson, Mar. 14, 2000), *aff'd by,* 45 S.W.3d 1 (Tenn.2001) (citing *State v. Burns,* 979 S.W.2d 276, 282 (Tenn.1998), *cert. denied,* 527 U.S. 1039, 119 S.Ct. 2402, 144 L.Ed.2d 801 (1999); *State v. Nesbit,* 978 S.W.2d 872, 891 (Tenn.1998), *cert. denied,* 526 U.S. 1052, 119 S.Ct. 1359, 143 L.Ed.2d 520 (1999)). Additionally, the admissibility of evidence ultimately is entrusted to the sound discretion of the trial court. *State v. Vincent C. Sims,* No. W1998–00634–CCA–R3–DD (citing *Hutchison,* 898 S.W.2d at 172). Absent an abuse of that discretion, such rulings will not be reversed on appeal. *State v. Vincent C. Sims,* No. W1998–00634–CCA–R3–DD (citing *State v. Caughron,* 855 S.W.2d 526, 541 (Tenn.), *cert. denied,* 510 U.S. 979, 114 S.Ct. 475, 126 L.Ed.2d 426 (1993)).

Initially, we acknowledge that the record belies the Appellant's assertion that the audiotape's admission was sought to rebut the testimony of Dr. Martell. The record is abundantly clear that the Appellant had every opportunity to question Dr. Martell regarding his consideration of the audiotape interview of Ms. Meadlin in making his diagnosis of the Appellant, yet he failed to avail himself of such opportunity. *See generally* Tenn. R.App. P. 36(a). Additionally, the Appellant fails to offer any valid reason as to why a deposition of Ms. Meadlin was not requested or as to why Detective Postiglione was not called to testify regarding his interview of Ms. Meadlin. *See generally* Tenn. R.App. P. 36(a). Finally, we fail to comprehend the Appellant's assertion that Ms. Meadlin's statement would rebut Dr. Martell's conclusion that the Appellant's delusional disorder was in substantial remission in the late 1990's when the incidents discussed by Ms. Meadlin occurred in the early 1990's. For these reasons, we cannot conclude that the trial court abused its discretion in excluding introduction of the audiotape interview of Ms. Meadlin. This issue is without merit.

[Deleted: VIII D. Cross–Examination of Janet Kirkpatrick]

[Deleted: IX. Introduction of Victim Impact Evidence]

## X. Use of Felony Murder Aggravating Circumstance

The jury returned verdicts finding the Appellant guilty of both premeditated murder and felony murder. The trial court properly merged the verdicts into one count of first-degree murder. At the subsequent sentencing hearing, the State proceeded to the penalty phase intending to prove the felony murder aggravating circumstance, Tenn.Code Ann. § 39–13–204(i)(7). The Appellant's objection was overruled and the State was permitted to use the (i)(7) aggravator. The jury subsequently found the aggravating circumstance applied beyond a reasonable doubt.

In *Carter v. State*, 958 S.W.2d 620, 624 (Tenn.1997), our supreme court approved the use of the felony murder aggravating circumstance to a general verdict of first-degree murder. While acknowledging the decision in *Carter v. State*, 958 S.W.2d at 624, the Appellant contends that the court erred by permitting the State to rely on the felony murder aggravating circumstance to seek a sentence of death because the use of the (i)(7) factor "violates the principles of death-sentencing as outlined by the Tennessee Supreme Court in *Middlebrooks*."[13] Essentially, the Appellant invites this court to overrule our supreme court's decision in *Carter v. State* and adopt the position that the use of the felony murder aggravating circumstance in any case where the defendant is convicted of felony murder is unconstitutional. We decline to do so.

## XI. Failure to Instruct on Non–Statutory Mitigators

During the penalty phase of the trial and acting pursuant to statutory authority, the Appellant filed a request for non-statutory mitigating circumstances to be included in the jury charge. Specifically, the non-statutory mitigating circumstances asserted in the request were:

1. Mr. Reid suffers from brain damage.
2. Mr. Reid sustained several brain injuries as a child.
3. Mr. Reid never received adequate treatment for his brain injuries as a child.
4. Mr. Reid has not received adequate treatment for his brain injuries as an adult.
5. Mr. Reid was born with a deformed ear, along with a hearing impairment.
6. Mr. Reid never received adequate medical treatment for his deformed ear and resulting hearing impairment.

**13.** We note that both the State and the Appellant acknowledge the legislature's response to *Middlebrooks* in its 1995 amendment to the (i)(7) aggravator. The amended aggravator is applicable where the murder "was *knowingly* committed, solicited, directed, or aided by the defendant, while the defendant had a *substantial* role in committing or attempting to commit [a specific enumerated felony]." Tenn. Code Ann. § 39–13–204(i)(7) (emphasis added). This court has concluded that the amended aggravator, even applied in cases where the sole verdict is that of felony murder, sufficiently narrows the class of death-eligible defendants, thereby creating no *Middlebrooks* problem. *See State v. James P. Stout*, No. 02C01–9812–CR–00376, 2000 WL 202226 (Tenn.Crim.App. at Jackson, Feb. 17, 2000), *perm. to appeal granted*, (Tenn.). The Appellant disputes this court's review of the amended statute, arguing that the *Middlebrooks* analysis is still applicable even with the current language. We find no sound reason to overrule this court's holding in *State v. James P. Stout*.

7. Mr. Reid suffers from the specific mental illness of schizophrenia.

8. Mr. Reid is unaware that he suffers from schizophrenia.

9. Mr. Reid has never received adequate medical treatment for his schizophrenia.

10. At the time of the offenses, Mr. Reid was not involved in any course of treatment for his schizophrenia.

11. At the time of the offenses, Mr. Reid was not taking any medication to control his schizophrenia.

12. When Mr. Reid was released from prison in Texas, he was not placed on any plan of follow-up medical care for his schizophrenia.

13. As a child, Mr. Reid lacked substantial guidance, discipline, and love from his parents.

14. Mr. Reid's parents were divorced when he was still very young.

15. Mr. Reid was taken from his mother's care at a very early age.

16. Mr. Reid's father was absent a great deal during his early childhood years.

17. Mr. Reid did not start school until he was almost seven years old.

18. Mr. Reid was placed in a boys' home at age eight.

19. Mr. Reid was a social outcast as a child.

20. Throughout his childhood years, Mr. Reid had only sporadic school attendance.

21. As a child, Mr. Reid was aware of his sister's sexual abuse at the hands of one of his stepfathers.

22. Mr. Reid lacked any substantial family support as a child, and he continues to lack that support as an adult.

23. In spite of his brain damage, mental illness, and difficult childhood, Mr. Reid has tried to lead a normal lifestyle.

24. Mr. Reid has made efforts to better himself.

25. Mr. Reid obtained his GED, and he then attended college at age 39.

26. In his daily tasks, Mr. Reid is polite and courteous to others.

27. STRICKEN

28. Mr. Reid does well in a structured environment, such as prison.

29. Mr. Reid's convictions in this case were based upon circumstantial evidence.

The trial court denied the Appellant's request to instruct the jury verbatim to the proposed instruction. Instead, the trial court, relying upon *State v. Odom* and *State v. Hodges,* found that a verbatim reading of the Appellant's instruction would amount to an unconstitutional comment upon the evidence. The trial court, instead, instructed the jury on the requested mitigators in general categories, including:

3. History of childhood.

4. Mental illness or mental or emotional disturbance.

5. Brain injury or damage.

6. Educational history.

7. Performance in a structured environment.

8. Family history and relationships.

In addition to instructions on specific statutory mitigating circumstances and the above mentioned non-statutory mitigating circumstances, the court provided the jury the following:

9. Any aspect of the defendant's background or character which [you] believe reduces the defendant's blameworthiness.

10. Any other mitigating factor which is raised by the evidence produced by either the prosecution or defense at either the guilt or sentencing hearing; that is, you shall consider any aspect of the circumstances of the offense favorable to the defendant which is supported by the evidence.

The Appellant complains that the court committed reversible error in refusing to instruct the jury on the specific non-statutory mitigating circumstances set forth in his request. He additionally contends that the manner in which the trial court instructed the jury regarding non-statutory mitigating circumstances did not adequately define for the jury the mitigating evidence presented.

In *State v. Odom*, 928 S.W.2d 18, 31 (Tenn.1996), the supreme court determined that:

The jury instructions [on mitigating circumstances] are critical in enabling the jury to make a sentencing determination that is demonstrably reliable. To ensure this reliability, the jury must be given specific instructions on those circumstances offered by the capital defendant as justification for a sentence less than death.

The court then recognized the importance of instruction on non-statutory mitigating circumstances as well as on statutorily enumerated mitigating circumstances. *See generally Odom*, 928 S.W.2d at 31 (citing Tenn.Code Ann. § 39-13-204(e)(1) (no distinction shall be made between statutory mitigators and those raised by the evidence)). However, the supreme court explained that instructions on non-statutory mitigating circumstances must not be fact specific and imply to the jury that the judge had made a finding of fact in contravention of Article VI, section 9 of the Tennessee Constitution. *See Odom*, 928

S.W.2d at 32 (court recognized risk of instruction amounting to unconstitutional comment upon evidence); *see also State v. Hodges*, 944 S.W.2d 346, 356 (Tenn.), *cert. denied*, 522 U.S. 999, 118 S.Ct. 567, 139 L.Ed.2d 407 (1997). Instead, the instructions on non-statutory mitigating circumstances must be "drafted so that when they are considered by the jury, the statutory mitigating circumstances are indistinguishable from the non-statutory mitigating circumstances." *Odom*, 928 S.W.2d at 32. In essence, an instruction on a non-statutory mitigating circumstance must be phrased in general categories similar to the statutory mitigating circumstances. *See, e.g., Hodges*, 944 S.W.2d at 355–356; *Odom*, 928 S.W.2d at 33.

 Again, the Appellant essentially complains that the trial court's lack of specificity and instruction in general categories defeated the purpose of the instructions and did not convey a fair picture of the mitigation proof. This identical argument was rejected by our supreme court in *State v. Hodges*, 944 S.W.2d at 356. In *Hodges*, the defendant argued that the trial court erred by denying his requested instructions on non-statutory mitigating circumstances. *Hodges*, 944 S.W.2d at 351. Instead, the trial court had instructed the jury on the following non-statutory mitigating circumstances: history of childhood; victim of child sex abuse; mental illness or mental or emotional disturbance; dominance by another person and/or immaturity; drug abuse; and any other aspect of the defendant's background or character or the circumstances of the offense, which would reduce the defendant's blameworthiness. *Id.* at 355. In reviewing the instructions on mitigating circumstances, the supreme court emphasized that a jury instruction on mitigating circumstances can be found "prejudicially erroneous" only if "it fails to fairly submit the legal issues or if it misleads the jury as

to the applicable law." *Hodges,* 944 S.W.2d at 352. The court observed that " '[j]urors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might.' " *Id.* at 352 (quoting *Boyde v. California,* 494 U.S. 370, 380–81, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990)). Our supreme court explained:

> Jurors interpret the instructions in a common sense manner and in light of the evidence presented at the trial. The defense assertion ignores the reality that these jurors had heard specific evidence during the sentencing hearing about the defendant's childhood, his immaturity, alleged sexual abuse, drug abuse, mental illness and emotional disturbance, as well as the dominance by Tina Brown. By their breadth, the instructions on non-statutory mitigating circumstances encompassed all the evidence presented by the defense at the sentencing hearing .... [T]he defendant's claim of error is without merit.

*Hodges,* 944 S.W.2d at 356 (citations omitted). While the instructions specifically requested by the defendant were not given, other instructions, as enumerated above, were provided to the jury, which "encompassed all the evidence" the defendant presented. *Id.; see also Brimmer v. State,* 29 S.W.3d 497, 520–521 (Tenn.Crim. App.1998).

In the instant case, the trial court clearly followed the directives of *Odom* and the example provided in *Hodges.* We conclude that the instructions provided by the trial court were substantially the same as those requested by the Appellant and that the instructions fairly submitted to the jury the legal issues. *See, e.g., Hodges,* 944 S.W.2d at 356; *State v. Rudolph Munn,* No. 01C01–9801–CC–00007, 1999 WL 177341 (Tenn.Crim.App. Apr. 1, 1999),

*perm. to appeal granted,* (Tenn. Nov. 9, 1999). Accordingly, the trial court's refusal to instruct the jury as to the proffered non-statutory mitigating circumstances was not error. This claim is without merit.

## XII. Sentence for Especially Aggravated Robbery

Following a sentencing hearing, the trial court sentenced the Appellant, as a Range I standard offender, to twenty-five years for the especially aggravated robbery conviction. The trial court further ordered that the sentence be served consecutively to the death sentences imposed in this case and consecutively to a sentence in Texas for which the Appellant was on parole at the time the offense was committed. On appeal, the Appellant argues that the trial court erred by imposing the maximum sentence for the especially aggravated robbery conviction and erred in ordering the especially aggravated robbery conviction to run consecutively to his death sentences.

 The Appellant bears the burden of establishing that the sentence imposed by the trial court was erroneous. *State v. Ashby,* 823 S.W.2d 166, 168 (Tenn.1991); *State v. Boggs,* 932 S.W.2d 467, 473 (Tenn. Crim.App.1996); *State v. Fletcher,* 805 S.W.2d 785, 786 (Tenn.Crim.App.1991). Appellate review of a sentence is *de novo,* with a presumption that the determinations made by the court from which the appeal is taken are correct. Tenn.Code Ann. § 40–35–401(d) (1997); *Ashby,* 823 S.W.2d at 169. In determining whether the Appellant has carried the burden, this court must consider the evidence received at the trial and the sentencing hearing, the pre-sentence report, the principles of sentencing, the arguments of counsel, the nature and characteristics of the offenses, existing mitigating and enhancing factors,

statements made by the offender, and the potential for rehabilitation. Tenn.Code Ann. § 40–35–210 (Supp.1998); *Ashby*, 823 S.W.2d at 169.

### A. Enhancement Factors

Especially aggravated robbery is a class A felony. Tenn.Code Ann. § 39–13–403(b). As a Range I standard offender, the sentencing range for especially aggravated robbery is fifteen to twenty-five years. Tenn.Code Ann. § 40–35–112(a)(1) (1997). The trial court sentenced the Appellant to the maximum sentence of twenty-five years for the especially aggravated robbery conviction. During sentencing, the trial court applied the following seven enhancement factors:

1. The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range.

3. The offense involved more than one victim.

5. The defendant treated or allowed a victim to be treated with exceptional cruelty.

10. The defendant had no hesitation about committing a crime when the risk to human life was high.

12. During the commission of the felony, the defendant willfully inflicted bodily injury upon another person, or the actions of the defendant resulted in the death of or serious bodily injury to a victim or person other than the intended victim.

13(B). The felony was committed while on any of the following forms of release if such release is from a prior felony conviction ... parole.

16. The crime was committed under circumstances under which the potential for bodily injury to the victim was great.

Tenn.Code Ann. § 40–35–114(1), (3), (5), (10), (12), (13(b)), (16) (1997). Additionally, the trial court applied mitigating factor 8 based upon the Appellant's mental condition, and applied mitigating factor 13 based upon "the majority of the testimony" developed during the capital penalty phase, including the Appellant's childhood history and his family history. Tenn.Code Ann. § 40–35–113(8), (13) (1997). On appeal, the Appellant only challenges the trial court's application of enhancement factors (3), (5), (10), and (16).

First, the Appellant contests the application of enhancement factor (3), "that the offense involved more than one victim." Specifically, the Appellant contends that because only one victim, Steve Hampton, was named in the indictment upon which he was convicted of especially aggravated robbery that the other victim, Sarah Jackson, cannot also be considered a victim of especially aggravated robbery. The Appellant further argues that there was no evidence at trial to prove that the perpetrator ever robbed or attempted to rob Sarah Jackson. Thus, the Appellant asserts, the trial court's application of enhancement factor 3 was erroneous. When applying this factor, however, the trial court reasoned that Sarah Jackson was also a victim of the robbery. We agree.

This court has defined "victim," as used in Tenn.Code Ann. § 40–35–114(3), as being limited in scope to a person or entity that is injured, killed, had property stolen, or had property destroyed by the perpetrator of the crime. *State v. Raines*, 882 S.W.2d 376, 384 (Tenn.Crim.App.1994). This court has also held that factor (3) may not be applied to enhance a sentence when the Appellant is separately convicted of

the offenses committed against each victim. *State v. Williamson*, 919 S.W.2d 69, 82 (Tenn.Crim.App.1995); *see State v. Lambert*, 741 S.W.2d 127 (Tenn.Crim.App. 1987). Accordingly, statutory enhancement factor (3) does not apply when there are separate convictions for each victim. *State v. Freeman*, 943 S.W.2d 25, 31 (Tenn.Crim.App.1996). Because the Appellant was not convicted of separate offenses against each victim, and because Sarah Jackson was clearly a victim as defined in *Raines*, the trial court properly applied enhancement factor (3) during sentencing. This issue is without merit.

 Second, the Appellant challenges the trial court's application of enhancement factor (5), that "the defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense." Specifically, the Appellant contends that "there is no evidence in the record suggesting that either of the victims were subjected to the type of torture that would justify the application of § 40–35–114(5)." At sentencing, the trial court applied factor (5) because there was evidence in the record that Sarah Jackson had moved after she was shot.

 Tennessee Code Annotated section 40–35–114 provides that enhancement factors must be "appropriate for the offense" and "not themselves essential elements of the offense." Accordingly, enhancement factors based on facts which are used to prove the offense or which establish the elements of the offense are excluded. *State v. Poole*, 945 S.W.2d 93, 98 (Tenn.1997). Moreover, because "exceptional cruelty" is inherent in some offenses such as aggravated assault, the facts must demonstrate a culpability distinct from and greater than that incident to the offense. *Id.* "Exceptional cruelty," when used as an enhancement factor, de-

notes the infliction of pain or suffering for its own sake or from the gratification derived therefrom, and not merely pain or suffering inflicted as the means of accomplishing the crime charged. Thus, cruelty requires more than the physical infliction of serious bodily injury upon a victim.

We first note that "exceptional cruelty" is not an element of especially aggravated robbery. Tenn.Code Ann. § 39–13–403(a)(2); *Poole*, 945 S.W.2d at 98. Moreover, proof of serious bodily injury, which is an element of especially aggravated robbery, does not necessarily establish the enhancement factor of "exceptional cruelty." *Poole*, 945 S.W.2d at 98. Exceptional cruelty is usually found in cases of abuse or torture. *State v. Williams*, 920 S.W.2d 247, 258 (Tenn.Crim.App.1995).

This court has recognized that "exceptional cruelty" is a matter of degree. *State v. Moore*, No. 02C01–9306–CC–00126, 1994 WL 245481 (Tenn.Crim.App. at Jackson, Jun. 8, 1994). In this regard, we first note that the taking of a life is not necessary to accomplish the offense of especially aggravated robbery. Additionally, the proof in this case established that the Appellant forced the victims onto the floor in the walk-in cooler. The anguish experienced by the victims at this point while they awaited their execution is unfathomable. Based upon the manner in which this crime was committed, and its consequences, we find that the Appellant's conduct established not only the infliction of serious bodily injury but also a calculated indifference toward suffering. Thus, we find application of enhancement factor (5) appropriate.

Finally, the Appellant challenges the trial court's application of enhancement factor (10), that the defendant had no hesitation about committing a crime when the risk to human life was high, and enhancement factor (16), that the crime was com-

mitted under circumstances under which the potential for bodily injury to the victim was great. Specifically, the Appellant argues that neither enhancement factor can apply because both are factors inherent to the offense of especially aggravated robbery.

With respect to enhancement factor (10), risk to human life is an essential element of the crime of especially aggravated robbery and cannot be used to enhance sentencing when the person facing danger is the named victim. *See* Tenn.Code Ann. § 40–35–114; *State v. Nix*, 922 S.W.2d 894, 903 (Tenn.Crim.App. 1995). However, this court has held that enhancement factor (10) may be applied where the defendant creates a high risk to the life of a person other than the named victim. *State v. Bingham*, 910 S.W.2d 448, 452–53 (Tenn.Crim.App.1995). We conclude that the presence of Sarah Jackson, who was not named in the indictment, during the robbery of Steve Hampton created a high risk to her life, which ultimately and unfortunately resulted in her death. Accordingly, the trial court properly applied enhancement factor (10). Enhancement factor (16), however, is inapplicable to the offense of especially aggravated robbery as bodily injury is an element of the offense. *Nix*, 922 S.W.2d at 903. Thus, the trial court erroneously applied factor (16). Notwithstanding the erroneous application of enhancement factor (16), we believe that the remaining six enhancement factors balanced against the two mitigating factors, fully support the maximum twenty-five year sentence imposed by the trial court.

### B. Consecutive Sentencing

The Appellant next argues that the trial court erred by ordering the especially aggravated robbery conviction to be served consecutively to the death sentences imposed in this case. Specifically, he asserts that "a sentence to be served consecutively to a sentence of death is not the least severe sentence necessary to achieve the purposes for which the sentence is imposed." Our supreme court has consistently upheld sentences consecutive to a death sentence. *See generally State v. Morris*, 24 S.W.3d 788 (Tenn.2000); *State v. Pike*, 978 S.W.2d 904, 928 (Tenn. 1998); *State v. Black*, 815 S.W.2d 166, 170 (Tenn.1991). Thus, this issue is without merit.

### XIII. Constitutionality of Tennessee's Death Penalty Statutes

The Appellant raises a myriad of challenges to the constitutionality of Tennessee's death penalty provisions. The challenges raised by the Appellant have been previously examined and rejected by case law decisions. The body of law upholding the constitutionality of Tennessee's death penalty provisions, specifically that rejecting the claims currently raised by the Appellant, are recited as follows:

1. Tennessee's death penalty statutes meaningfully narrow the class of death eligible defendants; specifically, the statutory aggravating circumstances set forth in Tenn.Code Ann. § 39–13–204(i)(2), (i)(6), and (i)(7), whether viewed singly or collectively, provide a "meaningful basis" for narrowing the population of those convicted of first-degree murder to those eligible for the sentence of death. *See Vann*, 976 S.W.2d at 117–118 (Appendix); *State v. Keen*, 926 S.W.2d 727, 742 (Tenn.1994).

2. The death sentence is not capriciously and arbitrarily imposed in that

(a) The prosecutor is not vested with unlimited discretion as to whether or not to seek the death penalty. *See State v. Hines*, 919 S.W.2d 573, 582

(Tenn.1995), *cert. denied,* 519 U.S. 847, 117 S.Ct. 133 [136 L.Ed.2d 82] (1996).

(b) The death penalty is not imposed in a discriminatory manner based upon economics, race, geography, and gender. *See Hines,* 919 S.W.2d at 582; *Brimmer,* 876 S.W.2d at 87; *Cazes,* 875 S.W.2d at 268; *Smith,* 857 S.W.2d at 23.

(c) Standards or procedures for jury selection exist to insure open inquiry concerning potentially prejudicial subject matter. *See Caughron,* 855 S.W.2d at 542.

(d) The death qualification process does not skew the make-up of the jury and does not result in a relatively prosecution prone guilty-prone jury. *See Teel,* 793 S.W.2d at 246; *State v. Harbison,* 704 S.W.2d 314, 318 (Tenn.), *cert. denied,* 470 [476] U.S. 1153, 106 S.Ct. 2261 [90 L.Ed.2d 705] (1986).

(e) Defendants are not unconstitutionally prohibited from addressing jurors' popular misconceptions about matters relevant to sentencing, *i.e.,* the cost of incarceration versus cost of execution, deterrence, method of execution. *See Brimmer,* 876 S.W.2d at 86–87; *Cazes,* 875 S.W.2d at 268; *Black,* 815 S.W.2d at 179.

(f) The jury is not instructed that it must agree unanimously in order to impose a life sentence, and is not prohibited from being told the effect of a non-unanimous verdict. *See Brimmer,* 876 S.W.2d at 87; *Cazes,* 875 S.W.2d at 268; *Smith,* 857 S.W.2d at 22–23.

(g) Requiring the jury to agree unanimously to a life verdict does not violate *Mills v. Maryland* [486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1990) ] and *McKoy v. North Carolina* [494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990) ]. *See Brimmer,* 876 S.W.2d at 87; *Thompson,* 768 S.W.2d at 250; *State v. King,* 718 S.W.2d 241, 249 (Tenn.1986), *superseded by statute as recognized by, Hutchison,* 898 S.W.2d at 161.

(h) The jury is required to make the ultimate determination that death is the appropriate penalty. *See Brimmer,* 876 S.W.2d at 87; *Smith,* 857 S.W.2d at 22.

(i) The failure to instruct on "the meaning and function of" mitigating circumstances was considered in *State v. Thompson,* 768 S.W.2d 239, 251–52 (Tenn.1989), and found not to constitute error.

(j) The defendant is not denied closing argument in the penalty phase of the trial. *See Brimmer,* 876 S.W.2d at 87; *Cazes,* 875 S.W.2d at 269; *Smith,* 857 S.W.2d at 24; *Caughron,* 855 S.W.2d at 542.

3. The appellate review process in death penalty cases is constitutionally adequate. *See Cazes,* 875 S.W.2d at 270–71; *Harris,* 839 S.W.2d at 77. Moreover, the supreme court has recently held that, "while important as an additional safeguard against arbitrary or capricious sentencing, comparative proportionality review is not constitutionally required." *See State v. Bland,* 958 S.W.2d 651, 663 (Tenn.1997), *cert. denied,* 523 U.S. 1083, 118 S.Ct. 1536 [140 L.Ed.2d 686] (1998).

4. Electrocution is a constitutionally permissible method of execution.[14] *See*

---

**14.** Recent legislation in this state has substituted death by lethal injection for death by electrocution. *See* Tenn.Code Ann. § 40–23–

114 (1998 Supp.) (changes method of execution from electrocution to lethal injection for those persons sentenced to death after Janu-

*Black,* 815 S.W.2d at 179; *see also Hines,* 919 S.W.2d at 582.

**[Deleted: XIV. Proportionality of Sentences of Death]**

### Conclusion

After a thorough review of the issues and the record before us, as mandated by Tenn.Code Ann. §§ 39–13–206(b), and (c), and for the reasons stated herein, we affirm the Appellant's convictions for two counts of first-degree murder and one count of especially aggravated robbery and accompanying sentences of death plus twenty-five years. In accordance with the mandate of Tenn.Code Ann. § 39–13–206(c)(1) and the principles adopted in prior decisions of the Tennessee Supreme Court, we have considered the entire record in this cause and find that the sentences of death were not imposed in any arbitrary fashion, that the evidence supports, as previously discussed, the jury's finding of the statutory aggravating circumstances, and the jury's finding that the aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt. *See* Tenn.Code Ann. § 39–13–206(c)(1)(A),(C). A comparative proportionality review, considering both "the nature of the crime and the defendant," convinces us that the sentences of death are neither excessive nor disproportionate to the penalty imposed in similar cases. Accordingly, we affirm the Appellant's convictions for two counts of first-degree murder and one count of especially aggravated robbery and the resulting sentences of

death plus twenty-five years imposed by the trial court.

DAVID G. HAYES, JUDGE

CONCUR: JOHN EVERETT WILLIAMS, Judge, JAMES CURWOOD WITT, JR., Judge.

**ORDER DENYING PETITION FOR REHEARING**

PER CURIAM.

The defendant, Paul Dennis Reid, has filed a petition to rehear the opinion of this Court filed on November 26, 2002. Upon due consideration, the petition is DENIED.

Justice BIRCH continues to adhere to the views expressed in his initial dissenting opinion, but concurs in the denial of this petition for rehearing.

---

ary 1, 1999). The new statute also provides that those persons sentenced to death prior to January 1, 1999, may choose to be executed by lethal injection by signing a written waiver. Hence, the Appellant's argument has not only been rejected by prior decisions but, now, also is irrelevant, as the capital defendant is no longer subjected to death by electrocution.